**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

**MOHAMMAD ALBANNA, BY AND THROUGH HIS CONSERVATORS AND, PARENTS AYESHA SHAH AND ZAKARIA ALBANNA, AND AYESHA SHAH AND ZAKARIA ALBANNA, INDIVIDUALLY,**

Plaintiffs.

Case No. 2:26-cv-03238

**v.**

**MEMPHIS-SHELBY COUNTY SCHOOLS,**

Defendant.

---

# COMPLAINT

---

**COME THE PLAINTIFFS,** through counsel, filing this Complaint against Memphis-Shelby County Schools. They show:

## I. PARTIES, JURISDICTION, AND VENUE

1. Mohammad Albanna ("Mohammad"), now twenty years old, is a young man with disabilities who resides with his parents, Ayesha Shah and Zakaria Albanna, his mother and father respectively (collectively, "Parents"), in Cordova, Shelby County, Tennessee. His Parents are Mohammad's duly appointed conservators and bring this matter on his behalf. They bring it individually as well, to the extent that reimbursement of educational costs, expenses, and fees requires suit in their names.

2. This action arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section

504"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*. ("ADA"). Jurisdiction is conferred upon this Court by 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA without regard to the amount in controversy, and by 28 U.S.C. §§ 1331 and 1343(a). This Complaint disputes the administrative Final Order (attached as **Exhibit A**).

3. Mohammad is a "child with a disability" within the meaning of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. ("IDEA"), 20 U.S.C. § 1401(3)(A), and an "individual with a disability" within the meaning of Section 504, 29 U.S.C. § 705(20), and the ADA.

4. Memphis-Shelby County Schools ("MSCS" or "the District") is the local education agency ("LEA") as defined in 20 U.S.C. § 1401(19). It receives federal funding and must provide special education to students who, like Mohammad, are eligible under the IDEA. It is a recipient of federal financial assistance subject to Section 504, and a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1). Upon information and belief, MSCS is the largest school district in Tennessee, enrolling more than 100,000 students.

5. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the boundaries of the Western District of Tennessee, and all events and omissions giving rise to this Complaint occurred in Shelby County, within this judicial district.

6. Administrative exhaustion of the IDEA claims occurred through a state due process hearing, Tennessee Department of Education, Administrative Procedures Division Case No. 07.03-262423J, tried on June 23 and 24, 2026, with a Final Order entered by a Tennessee administrative law judge ("ALJ") on July 20, 2026. The ALJ had no authority to adjudicate claims arising under Section 504 or the ADA, see Tenn. Code Ann. § 49-10-606, and rendered no

administrative ruling on those claims. Plaintiffs have thus exhausted administrative remedies as required by 20 U.S.C. § 1415(l).

7. This action is timely under either limitations period that could apply. It is filed within sixty (60) days of the Final Order, and well within the ninety (90) days provided by 20 U.S.C. § 1415(i)(2)(B).[1]

## II. INTRODUCTION

8. The IDEA demands a "markedly more demanding" approach to FAPE than the *de minimis* standard which had allowed students to "[sit] idly ... awaiting the time when they were old enough to drop out." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 191 (1982)). A school must offer an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and must then deliver services "in conformity with" that IEP. *Id.* at 399; 20 U.S.C. § 1401(9)(D).

[1] The NOTICE OF APPEAL PROCEDURES attached to the Final Order states that a party "may file an appeal the decision in federal or state court within 60 days of the date of entry of the Final Order." MSCS has told this Court otherwise. In *Memphis-Shelby County Schools v. K.B.*, No. 2:25-cv-02406-TLP-atc, the District argued that "[t]he time for filing a judicial review action of an IDEA due process case in federal court is 90 days because Tennessee has not explicitly shortened the time to file a civil action for judicial [review] in federal court," and that reading Tenn. Code Ann. § 4-5-322(b)(1)(A)(iv) otherwise "would lead to the absurd result that federal district courts in Tennessee would lack subject matter jurisdiction to determine IDEA civil actions for judicial review." (K.B. III, ECF No. 19.) This Court agreed. *See K.B. v. Memphis-Shelby Cnty. Schs.*, Nos. 2:22-cv-02464-TLP-cgc, 2:25-cv-02265-TLP-tmp, 2:25-cv-02406-TLP-atc, ECF No. 148 (W.D. Tenn. Feb. 23, 2026) (holding that § 4-5-322(b)(1)(A)(iv) "does not create an explicit time limitation for bringing a civil action under the IDEA" and that "the default 90-day limitation in § 1415(i)(2)(B) applies here"). Nonetheless, MSCS continues to tell parents (see, https://www.scsk12.org/exceptional/files/2025/Procedural_Safeguards_english_2024.pdf) and the Tennessee Administrative Procedures Division ("APD") continues to inform parties that the deadline to file a judicial review action is 60 days. This conflicting advice is itself an IDEA violation as it violates parents' rights to be correctly informed of their procedural due process rights, prejudices them with either a shortened time frame or the potential for missing their statute of limitations deadline, and impedes their meaningful parental participation. Plaintiffs raise the point so that it is preserved and so that the Court is aware of it.

9. What is at stake in that failure is not only skills. It is dignity. Congress said so when it enacted the IDEA, finding that "[d]isability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society," and declaring the Act's purpose to be the provision of an education "designed to meet [students'] unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(c)(1), (d)(1)(A).

10. Self-determination is "a fundamental human right, universally applicable regardless of disability." Jackie Ryan et al., *Being able to be myself: Understanding autonomy and autonomy-support from the perspectives of autistic adults with intellectual disabilities*, 28 Autism 3092, 3092 (2024). And the research is clear that where autistic young adults with significant support needs appear less autonomous than their peers, the deficit lies in what they have been offered rather than in who they are: reduced self-determination "may be due to having fewer opportunities and/or less support to engage in self-determined behaviors than others," and disability "should not affect an autistic young adult's ability to be self-determined, including exerting autonomous behavior, but will affect the level of support the person needs." *Id.* at 3093.

11. The harm runs in a predictable direction. Professionals "often exert external control over individuals with autism and/or [intellectual disability]," and this is especially true for those who do not communicate in conventional ways, "because people think that they are not capable of autonomous behavior." *Id.* The assumption produces the result, and the result then vindicates the assumption.

12. That circle is visible on the face of this record. Mohammad Albanna can learn. That is the premise on which experts[2] retained by the District built his program. The September 16, 2024 Holland Center Consultation Training Report, admitted at hearing as Exhibit 2[3], states it in terms: the recommendations were made "with the approach that 'all students can learn when taught correctly, regardless of past history and background and that all teachers can be successful, given effective teaching materials and presentation techniques.'"

13. The record bears that out. When the Holland Center's consultants modeled effective teaching and prompting procedures at Germantown High School in September 2024, the report records what happened: "The use of effective teaching and prompting procedures during subsequent training days resulted in a decrease in off-task responses and an increase in on-task learning responses." The District said the same thing in its own Prior Written Notice, which recorded that the Holland Center's recommendations "provided Mohammad with strategies that were successful during and after the visit from the Holland Center." His special education teacher testified that giving him more opportunities on a goal "will increase MA's opportunity to show progress."

14. But what the Holland Center consultants encountered amongst the District employees working with Mohammad was confusion, division, and inconsistency, both impeding Mohammad's ability to learn. For example, when the Holland Center consultants arrived in

---

[2] As will be explain below, Plaintiffs sought and negotiated for the involvement a private Applied Behavior Analysis ("ABA") provider, the Holland Center based in Minnesota, to deliver consulting services to Mohammad's individualized education program ("IEP") team. 20 U.S.C. § 1414(d)(1)(B); 34 CFR § 300.321.

[3] The ALJ only admitted Hearing Exhibit 2 "for proof that the training occurred and that a report was made, but not for the truth of the matter asserted," and directed immediately afterward that "[w]e're not going to have any testimony from the report itself." Tr. Vol. I at 76. This ruling was in error as is argued below.

September 2024, they found the IEP team divided over a single buttoning skill: one approach was to teach Mohammad to button his shirt, using prompting, prompt fading, and shaping; the other was "to ensure that Mohammad is only given shirts that are pull-overs to wear to eliminate the need to teach the skill." Hr'g Ex. 2. Every functional goal in Mohammad's IEP — dressing himself, completing a hygiene routine, telling time, identifying quantities at a grocery store, dialing his own father's telephone number — is a goal about whether he will one day be able to act for himself rather than wait for someone else to act for him.

15. Teaching those skills is how a school not only provides the free appropriate public education ("FAPE") required by the IDEA, see 20 U.S.C. § 1401(9) and 34 C.F.R. § 300.17, but how it honors a student's dignity. Writing those goals into an IEP and then declining to deliver the supervised, faithful instruction that would actually teach them is how a school denies it. That is what MSCS did to Mohammad, and on this record it is what MSCS continues to do while the years remaining to him rapidly run out.

16. Applied Behavior Analysis ("ABA") is not a philosophy to be absorbed and then improvised. It is a set of procedures that produces gains only when it is run as written, and that stops producing them when it is not. The professional literature is explicit on both halves of that proposition. ABA is an established evidence-based best practice for students with autism, but when it is delivered in American public schools it "often lack[s] fidelity and integrity of implementation," and "[w]hen evidence-based practice is not sustained with continued fidelity of implementation, student disruptive and maladaptive behaviors typically return to baseline levels or even increase, thus rendering the intervention ineffective overall." Chana Max & Nicole Lambright, *Board certified behavior analysts and school fidelity of Applied Behavior Analysis services: qualitative findings*, 68 Int'l J. Developmental Disabilities 913, 914 (2022). Good

intentions do not close that gap. Special education teachers rate their own knowledge of ABA "significantly higher than their actual application of behavior analytic practices," and even with extensive training, ongoing mentoring, and adequate time, school staff "typically only achieve a moderate level of procedural fidelity." *Id.*

17. What closes the gap is supervision. The Board Certified Behavior Analyst ("BCBA") is the professional who writes the program, trains the staff who will deliver it, runs fidelity checks on that delivery, reviews the resulting data, and corrects course when the data require it; the highest levels of fidelity are found in organizations that actually monitor implementation, and the loss of that monitoring produces "decreased outcomes for students." *Id.* at 913–14. That is why Mohammad's IEP team also adopted an eleven-page Behavior Intervention Plan ("BIP") specifying a token economy, motivating operation manipulations, effective instructional delivery techniques, and a least-to-most prompting hierarchy with an enumerated escalation sequence. And it reserved "Program Oversight" to a BCBA, who was to provide "initial and ongoing staff training" on the plan and to conduct "direct observation at least once per month during the academic school year as a part of [Mohammad's] ABA services on his IEP." Fidelity was the point of that structure and the BCBA was its mechanism. Without the supervisor there is no fidelity check; without the fidelity check there is no fidelity; and without fidelity there is no program, only the appearance of one.

18. For the 2024-2025 school year, that structure had a person in it. Jennifer Wyatt, the District's BCBA, testified that she was "the person during 2024-2025, as of October 1, 2024, that was providing [Mohammad's] ABA services on his IEP," that she conducted the required monthly observation, and that she satisfied the training obligation "[b]y going in for the two hours a week,

ensuring that the IEP goals were being followed, following the Behavior Intervention Plan, and making sure I was training right on site."[4] Tr. Vol. II at 110-111.

19. Then Ms. Wyatt unilaterally chose to stop providing services. On direct examination by the District's own counsel, Ms. Wyatt testified that she did not continue on Mohammad's IEP team after the annual IEP adopted October 3, 2025: "I did not. I don't even think I came to the October meeting." Counsel then asked the question that should have decided this case:

> Q: Were you asked to continue to perform ABA services for MA after October 3, 2025?
>
> A: No.

Tr. Vol. II at 119-120.

20. No one replaced her on this record. Not the special education teacher, not the paraprofessional, not the occupational therapist, not any witness the District called. No witness testified that any BCBA provided Mohammad's twice-weekly ABA sessions, trained staff on his BIP, or conducted the monthly observation at any point in the 2025-2026 school year. And the paper never changed. The administrative judge found as fact that under the October 3, 2025 IEP "[t]he services provided and accommodations remained unchanged." For an entire school year, Mohammad's IEP promised ABA therapy from a BCBA twice a week, and the proof shows *no one* delivering it.

21. The Final Order determined that the District provided FAPE for the 2024-2025 school year and for the 2025-2026 school year. It never mentions any of this. It contains no finding identifying who provided BCBA services in 2025-2026. It contains no finding that anyone did. It states instead

---

[4] Plaintiffs also contend that Jennifer Wyatt did not adequately perform her responsibilities as a BCBA when she was – theoretically – in that role. For example, she was the only person providing services to Mohammad who did not attend the initial training from the Holland Center. But at least while she actually purported to be supervising Mohammad's ABA, a licensed BCBA was attempting to deliver the ABA services guaranteed in his IEP.

that "[a]ll testimony, including testimony from Holland Center employees, proved that all four areas were met," and supports that sentence by reciting what Ms. Wyatt did, in a finding the Order itself expressly confines to "the relevant 2024-2025 school year." Final Order at 16; see also *id*. at 10 (Finding of Fact 32).

22. Nor is the BCBA vacancy the only failure of fidelity. The Holland Center came to Memphis four times and produced four written reports. The District paid for every visit. And the District accepted what it paid for. The September 2024 report closed with nine numbered recommendations. The Prior Written Notice for the October 1, 2024 IEP meeting — read into the record by the District's own Board Certified Behavior Analyst, on direct examination by District counsel — recites the IEP team's agreement to each of the nine in turn, by number and by name. Tr. Vol. II at 96-97. The Behavior Intervention Plan the team adopted four weeks later tracks those nine recommendations section for section, in order. Ex. 3. The team departed from the Holland Center in a single respect, declining to withdraw the one-to-one paraprofessional during lunch, and it recorded that departure on the face of the plan. Ex. 3, § IX. The Final Order nonetheless found that "the IEP team did not agree that any of the specific recommendations, procedures, or steps for teaching any particular goal or benchmark" applied. Final Order at 10 (Finding of Fact 36). That finding is refuted by the District's own exhibits and by the testimony the District itself elicited. A district that purchases expert consultation, adopts the resulting recommendations almost without exception, writes them into a binding behavior plan, and then leaves the procedures to improvisation in the classroom has not implemented the plan. It has documented its obligation and declined to perform it.

23. The time to fix this is running out. Mohammad is twenty years old. He graduated with a special education diploma in May 2025 and returned under his continuing eligibility. In Tennessee,

Mohammad is only eligible for IDEA services until his twenty-second birthday. Tenn. Comp. R. & Regs. 0520-01-09-.05

24. Whatever education he is owed must be delivered inside a window now measured in months. Every year the District promised BCBA-supervised instruction and did not deliver it is a year that cannot be re-run. *Endrew F.* forbids leaving a child to sit idly. That is what happened here, and the hour is late.

## III. FACTS

### *Mohammad*

25. Mohammad is an IDEA-eligible student with diagnoses of autism spectrum disorder, attention-deficit/hyperactivity disorder, dysgraphia, and dyslexia. The primary disability identified on his IEP is autism. He attended Germantown High School in the MSCS system, graduated in May 2025 with a special education diploma, and returned for the 2025-2026 school year under his continued eligibility.

26. Mohammad has also returned this school year, the 2026-2027 school year, to Germantown High School where he is currently a student.

27. His independent functional skills are limited. As the Final Order found, he reads at approximately a second-grade level; his math skills are at a kindergarten level and he needs prompting to count to 100; he cannot consistently write or type his own name correctly; he confuses the numbers 6 and 9 and so cannot reliably dial his father's telephone number; and he cannot always button his shirt.

28. Plaintiffs do not dispute those findings. They dispute the inference the Final Order drew from them. These limitations demonstrate what was at stake in every hour of service the District

promised and did not deliver, and they matter here because the District treated them as a ceiling rather than as a description of where teaching had to begin.

***What Happens When Mohammad Is Taught Correctly***

29. The premise of Mohammad's program, written into the report the District paid for and the Final Order admitted, is that "all students can learn when taught correctly, regardless of past history and background." Hr'g Ex. 2. The record repeatedly confirms that premise as applied to him.

30. Mohammad's academic skills are real, measurable, and hard-won. He has dyslexia. He nonetheless reads. The September 2024 progress report records that he read at an average of 53 words per minute during small-group reading sessions with prompting. Tr. Vol. I at 30. Plaintiffs contend that Mohammad learned to read because of the private ABA services his family provided him.

31. Mohammad has dysgraphia. He nonetheless types. The same progress report records that he was typing at twelve words per minute and that he could type a telephone number on the keyboard without verbal cues 50% of the time. Tr. Vol. I at 28-29. Plaintiffs contend that Mohammad learned to type because of the private ABA services his family provided him.

32. Outside school Mohammad swims, holds a belt in karate, and is learning to play the drums. He is a beloved son, brother, and friend. These are not the attainments and qualities of a young man who cannot be taught. They are the attainments and qualities of a young man who wants to learn, can learn, and has dignity and worth.

33. The Final Order describes none of this. It recites instead that Mohammad "has extremely limited skills for a 19-year-old male," that "[h]is math level is that of a kindergartener," that "he can read at only a second-grade level," and that "[w]hile Petitioner [Mohammad] can type, he cannot consistently type his father's telephone number or even spell his own name correctly." Final

Order at 17. Each statement has some support in the record. Assembled without counterweight, they compose a portrait of a young man for whom nothing further is possible — and that portrait then does the work of excusing the failure to teach him. The same record shows him gaining reading fluency, typing skill, and functional independence whenever instruction was delivered as designed and through ABA. The question presented is not whether Mohammad's skills are limited. It is whether the District delivered the instruction that would have expanded them.

34. The September 16, 2024 Holland Center consultation report records that "[t]he use of effective teaching and prompting procedures during subsequent training days resulted in a decrease in off-task responses and an increase in on-task learning responses." Hr'g Ex. 2. The consultants were describing what happened when they themselves ran the procedures with Mohammad, in his own classroom, over five days.

35. The District said the same thing in writing, and it went considerably further. The September 16, 2024 report closed with nine numbered recommendations: (1) Token Economy; (2) Motivating Operation Manipulations; (3) Effective Instructional Delivery; (4) Mand Training; (5) Physical Education Class; (6) Activities of Daily Living; (7) Data Collection; (8) Program Oversight; and (9) Use of a One-to-One Paraprofessional. On direct examination by District counsel, the District's own Board Certified Behavior Analyst read the Prior Written Notice for the October 1, 2024 IEP meeting into the record. It recites the IEP team's disposition of every one of the nine: the team "agreed to recommendations 1 (Token Economy), 2 (Motivational Operation Manipulations)[5], and 3 (Instructional Delivery)"; recommendation 4 (Mand Training) "will be incorporated into the speech goals"; recommendation 5, the "physical education recommendations will continue being

[5] The report uses the term "Motivating Operation Manipulations," but the transcript reads "motivational Operation Manipulations."

used and supported by the Occupational Therapist"; recommendation 6, "activities of daily living will be incorporated into goals"; recommendation 7, "Data Collection documents provided by the Holland Center will be utilized"; recommendation 8, "MSCS Behavior Analyst will provide initial and on-going staff training aligned with ABA strategies in the IEP[,] Direct Observation will occur monthly, Review of data and data collection methods and data collections by MSCS staff, data based programming decisions will be made by the IEP team"; and recommendation 9, "Use of one on one will be incorporated into transition plan," subject to "[t]he change of having the one on one not with him during the cafeteria due to safety." Tr. Vol. II at 96-97. The same Prior Written Notice records that the team "was in agreement with recommendations 1-3 from the Holland Center report[, which] provided [Mohammad] with strategies that were successful during and after the visit from the Holland Center." Tr. Vol. II at 97.

36. Mohammad's occupational therapist, Dr. Emily Smith, testified that after she obtained a modified hand-held can opener that locks into place so that Mohammad no longer had to maintain pressure on it, "[h]e ended up making good progress with that goal, and he was able to open up cans with that particular can opener." Tr. Vol. II at 285-286. Mohammad's special education teacher, Baretta McKinney, agreed that "[g]iving him more opportunities to work on those goals, yes, will increase [Mohammad's] opportunity to show progress." Tr. Vol. II at 200.

37. The conclusion the record supports is not that Mohammad had reached his ceiling. It is that he progressed where the agreed procedures were run and stalled where they were not.

### *The Program the Parties Built, and Why Fidelity Mattered*

38. This is not the family's first attempt to secure an appropriate program. They filed a due process complaint in August 2022, resolved by a September 9, 2022 settlement agreement. They

filed two more during the 2023-2024 school year. The second resulted in an August 30, 2024 settlement of all issues.

39. As a result of that settlement, at the parents' request and by agreement of the parties, the District entered into a Professional Services Agreement with the Holland Center, a Minnesota ABA provider. The District paid for travel, accommodations, and per diems so its consultants could come to Memphis. They were to train District employees, participate in IEP meetings, observe District employees, and provide feedback and corrections consistent with ABA. They came to Germantown High School twice during the 2024-2025 school year and twice during the 2025-2026 school year.

40. The first visit, September 9 through 16, 2024, was a five-day training conducted by Marietta Hemming, M.Ed., BCBA, and Taylor Lundgren, M.S., BCBA. Every member of Mohammad's team – except one – was present for some part of it: his special education teacher, his one-on-one paraprofessional, the District behavioral consultant, his speech therapist, and his occupational therapist. The resulting report is Hearing Exhibit 2. That report found, among other things, that "the team is operating off of an outdated IEP" and that "[s]ome goals and objectives targeted throughout Mohammad's day are not current goals and do not need to be taught or have data collected on."

41. Notably, the District's BCBA – upon information and belief, the one and only BCBA for Tennessee's largest school district and one of the twenty-five largest school districts in the nation with over 100,000 students – did not meaningfully participate in either training. Ms. Wyatt so testified. Of the September 2024 training she said she "mainly sat in a room based in another building and waited until the end of the day," was "in a separate room doing paperwork," and "didn't get to see anything," receiving only a thirty- to forty-five-minute conversation at the end

of the day. Tr. Vol. II at 114. Of the February 2025 training she said: “The same thing. I was off in a room. I was waiting until the end of the day.” Tr. Vol. II at 115.

42. Mohammad’s IEP dated October 30, 2024, contained four transition goals and ten annual goals with one to five benchmarks each. Among the services it committed the District to provide: the functional skills classroom five days a week for six hours per day; a one-on-one paraprofessional five days a week for seven hours per day; speech-language services twelve times per month; occupational therapy six times per month; and ABA therapy from a BCBA two times a week for sixty minutes each session.

43. Under “Supplementary Aids, Services, and Least Restrictive Environment,” the IEP listed “ABA methodology, verbal behavior instructions, as represented in BIP to be used across all academic and nonacademic settings.” Ex. 4, p. 15. It further directed that “the paraprofessional will fade support” when appropriate. *Id.* p. 17.

44. The IEP also includes ABA provided by “Behavior Analyst” under “Direct Special Education Services” for two hours per week. *Id*. p. 16.

45. The IEP team adopted an eleven-page Behavior Intervention Plan effective October 30, 2024 (Hearing Exhibit 3), drawn in substantial part from the September 2024 Holland Center report. Ms. Wyatt confirmed that Section I of the BIP, governing the token economy, “was excerpted from the Holland Center Behavior Report.” Tr. Vol. II at 100.

46. The BIP is not a statement of philosophy. It specifies procedures. It directs the use of a token economy with a varying rate of exchange, motivating operation manipulations, and effective instructional delivery techniques. It carries a negotiated amendment recording that at the October 1, 2024 IEP meeting the team “discussed and agreed that the removal of tokens (also referred to as response cost) should not be used with [Mohammad] unless or until he is no longer motivated

by receiving tokens." Tr. Vol. II at 100. And at Section B, page 9, it prescribes a prompting hierarchy. Reading from the exhibit at the District's request, Ms. Wyatt testified: "The prompting hierarchy recommended is, listed least-to-most prompting. So we use a visual (if appropriate) with the vocal plus visual, then go to gestural plus vocal plus visual, go to physical plus gestural plus vocal plus visual." Tr. Vol. II at 101.

47. Section VIII of the BIP, titled "Program Oversight," set out the commitments on which this appeal principally turns. As read into the record by Ms. Wyatt, Tr. Vol. II at 68-69, the IEP team determined that:

> • MSCS's BCBA will provide initial and ongoing staff training on [Mohammad's] BIP.
>
> • The Holland Center will provide scheduled trainings and support as outlined in their Professional Services Agreement with the District.
>
> • The Holland Center's quarterly trainings and support will occur quarterly, unless a different cadence occurs pursuant to the Holland Center's Professional Services Agreement with the District.
>
> • MSCS will conduct direct observation at least once per month during the academic school year as a part of [Mohammad's] ABA services on his IEP.
>
> • The IEP Team will make data-based programming decisions to make recommendations and determinations for [Mohammad's] IEP/BIP.
>
> • Data collection will be completed by MSCS staff.
>
> • The Holland Center's input and recommendations will be considered by the IEP Team.

48. Prompting hierarchies, prompt fading, task analysis, and reinforcement schedules are not decorative. Ms. Hemming explained at hearing what happens when they are run loosely: the rate of skill acquisition "is going to slow down ... substantially," and "prompt dependency develops," which she described as "the habit of waiting for prompts to be given." Tr. Vol. I at 102-103. Fidelity is the mechanism by which ABA produces gains.

49. Ms. Wyatt testified at hearing that she "didn't agree with a BIP being needed at that time." Tr. Vol. II at 122. That testimony, offered nearly two years after the fact and in defense of the District's conduct, cannot bear the weight the Final Order places on it. Ms. Wyatt is the same behavior analyst who wrote a Functional Behavior Assessment for Mohammad in February 2024, on her own initiative and months before the Holland Center was engaged. Tr. Vol. II at 66. She testified that she had prepared an FBA or a behavior intervention plan for Mohammad before October 30, 2024, which "was not agreed upon by the team," and could not recall why — and the ALJ terminated that line of questioning before it could be developed, stating that it was "not the focus of this hearing." Tr. Vol. II at 91. A Board Certified Behavior Analyst who conducts a functional behavior assessment of a student has necessarily concluded that the student's behavior warrants functional assessment.

50. Ms. Wyatt then signed the October 30, 2024 plan, testified that she "would follow what the team agreed," Tr. Vol. II at 122, and performed under it, describing the "fidelity checks" she conducted during her weekly two hours with Mohammad, Tr. Vol. II at 67. Her disclaimer appeared for the first time at the hearing, in response to the ALJ's own questioning, and it is inconsistent with everything she wrote, signed, and did before this dispute was filed.

51. More fundamentally, what one member of an IEP team says at a due process hearing does not unmake what the team decided. The IDEA vests the determination in the team, not in any individual member, and requires the team to consider positive behavioral interventions and supports for a child whose behavior impedes his learning or that of others. 20 U.S.C. §§ 1414(d)(1)(B), (d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i). This team took up that question expressly. The October 1, 2024 IEP team minutes, admitted as Exhibit 7, record that "[t]he Holland Center identified behaviors as interfering with instruction … and interfering with progress," that

"[t]he team was asked if the behaviors that are interfering with his learning need[] to be addressed in the Behavior Intervention Plan," and that the team then "discussed the behaviors were able to be addressed using the teaching strategies." Tr. Vol. II at 132-133. The team answered the question by adopting an eleven-page plan on October 30, 2024, and by writing it into the IEP as a service to be delivered "across all academic and nonacademic settings." Ex. 4, p. 15. The Prior Written Notice records the team's agreement to all nine of the Holland Center's recommendations. Tr. Vol. II at 96-97. An IEP team that poses the question, deliberates it, resolves it, and memorializes the result in three separate documents has determined that the plan was needed. Once it did, the plan was the District's obligation, and the District was not free to revisit that determination in the classroom or in this litigation. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(c)(2).

***2024-2025: The Structure Had a Person in It***

52. During the 2024-2025 school year, Jennifer Wyatt was the District's BCBA assigned to Mohammad. She is a licensed BCBA with a background in special education teaching. The administrative judge found that she observed Mohammad at least monthly, reviewed the data and data collection methods of District staff, and provided at least two hours per week of ABA services.

53. Upon information and belief, Jennifer Wyatt was and continues to be the only BCBA employed by MSCS.

54. Examined about BIP Section VIII by the District's counsel, Ms. Wyatt confirmed her role. Asked whether she was "the person during 2024-2025, as of October 1, 2024, that was providing Mohammad's ABA services on his IEP," she answered "Yes." Asked whether she conducted direct observation at least once a month, she answered "I did." Tr. Vol. II at 111. Asked whether she believed she had fulfilled the BIP's staff-training obligation, she answered "I do," and explained: "By going in for the two hours a week, ensuring that the IEP goals were being followed, following

the Behavior Intervention Plan, and making sure I was training right on site." Tr. Vol. II at 110-111.

55. Whatever else is disputed about that year, this is not: every bullet in Section VIII that required a District BCBA was, on this record, performed by District BCBA Jennifer Wyatt.

***October 2025: The District's BCBA Leaves and Is Not Replaced***

56. On October 3, 2025, the IEP team adopted Mohammad's annual IEP for the 2025-2026 school year. Ms. Wyatt did not attend.

57. That IEP, admitted at hearing as Exhibit 10, once again listed ABA both under Mohammad's related services section and under the heading "Direct Special Education," where the IEP specified that Mohammad would again receive two hours per week of ABA as direct special education. Ex. 10, p. 14. The difference was that the entry specifies "Jennifer Wyatt" under the "Provider Title" column. *Id*. Perhaps that is because Jennifer Wyatt is the District's only BCBA, and therefore the only District employee who could actually provide the educational service that Mohammad's IEP team agreed that he needed.

58. Two features of that entry deserve emphasis. First, every other service on the page identifies its provider by title — "Special Education Teacher," "Occupational Therapist," "Speech Language Pathologist," "Assigned Paraprofessional," "MSCS Staff." The ABA entry alone names an individual: Jennifer Wyatt. Second, the service runs for a full year, from October 3, 2025 through October 2, 2026. On the very day Ms. Wyatt stopped attending Mohammad's IEP meetings, the District committed in writing to deliver him two hours per week of ABA instruction from Jennifer Wyatt for the following twelve months. She testified she was never asked to provide it.

59. The categorization also matters. Under the IDEA, "special education" means specially designed instruction to meet the unique needs of a child with a disability, while "related services" are supportive services required to assist a child with a disability to benefit from special education. 20 U.S.C. § 1401(26), (29). By placing ABA under Direct Special Education, the IEP team characterized it not as a support that helps Mohammad benefit from instruction, but as instruction itself — one of only two forms of specially designed instruction his program provided, the other being the functional skills classroom. The District's failure to deliver it was therefore not a shortfall in a supportive service. It was the elimination of one of the two components of Mohammad's specially designed instruction for an entire school year.

60. The entry also identifies the goal the service supports: Goal 5, the behavior goal, which provides that "[i]n classroom and community settings, Mohammad will complete all assignments/tasks/activities with 80% accuracy 4 of 5 trials, as documented by data collection 2x per week." Ex. 10. That is a goal about whether Mohammad can do the work at all, in the classroom and in the community. The service the IEP team assigned to it was ABA, and for the year in question the District assigned no one to deliver it.

61. On direct examination by counsel for the District, Ms. Wyatt was asked whether she "continue[d] on [Mohammad's] IEP team after his annual IEP for the 25-26 school year, which I'm going to represent to you, started on October 3, 2025." She answered: "I did not. I don't even think I came to the October meeting." Tr. Vol. II at 119. Asked why, she answered: "My role as a professional was no longer being respected or even heard. So ethically, I couldn't continue if I can't work with everybody on the team." Tr. Vol. II at 119-120.

62. District counsel then asked whether, "to your knowledge," ABA services remained on Mohammad's services page after October 3, 2025. Ms. Wyatt answered "To my knowledge." The

ALJ sustained an objection to that answer on the ground that she, having left the team, would have no way to know. Tr. Vol. II at 120.

63. District counsel then asked the question whose answer the Final Order never confronts: "Were you asked to continue to perform ABA services for [Mohammad] after October 3, 2025?" Ms. Wyatt answered: "No." Tr. Vol. II at 120.

64. That answer came from the District's own witness, elicited by the District's own counsel, on direct examination, without objection. It was never contradicted, qualified, or explained away.

65. The record contains no evidence of who, if anyone, succeeded her. No witness testified that a BCBA provided Mohammad's twice-weekly ABA sessions during the 2025-2026 school year. No witness testified that a BCBA provided initial or ongoing staff training on the BIP that year. No witness testified that anyone conducted the monthly direct observation the BIP made "part of [Mohammad's] ABA services on his IEP." No document in evidence identifies a successor.

66. Upon information and belief, no BCBA was assigned to Mohammad for all or substantially all of the 2025-2026 school year. To the extent the District contends otherwise, the records establishing who provided those services, when, and for how long are in its exclusive possession, and Plaintiffs are entitled to develop them in this action.

67. Meanwhile the paper stayed the same. The October 3, 2025 IEP left the services unchanged. The BIP, with its Program Oversight section, remained in force. Mohammad's IEP continued to promise ABA therapy from a BCBA two times a week, sixty minutes a session, through a school year in which the District had, on this record, no BCBA for him.

***Without a Behavior Analyst, Mohammad Had No Way In***

68. For Mohammad, applied behavior analysis is not one service among several. It is the means by which instruction reaches him at all.

69. Mohammad's IEP says so. Under "Supplementary Aids, Services, and Least Restrictive Environment" — the section describing what must be in place for him to participate — the IEP specifies "ABA methodology, verbal behavior instructions, as represented in BIP to be used across all academic and nonacademic settings." Hr'g Ex. 4, p. 15. Not in a therapy room. Not for an hour twice a week. Across every setting in which he is expected to learn anything.

70. The IEP says so twice, and in two different registers. The supplementary aids entry addresses what school personnel need in order to support Mohammad in his goals. The services page addresses what Mohammad himself receives, and there ABA appears as Direct Special Education — two hours per week, in the special education setting, from October 3, 2025 through October 2, 2026. Ex. 10, p. 14. Whatever the supplementary aids entry is read to require of staff, the Direct Special Education entry independently obligated the District to deliver applied behavior analysis to Mohammad throughout the 2025-2026 school year and into the current (2026-2027) school year. The Final Order does not address that entry, and does not anywhere acknowledge that Mohammad's IEP classified ABA as specially designed instruction rather than as a related service.

71. That is what the clinical literature and the courts describe. Applied behavior analysis "is not a substitute for education"; it "ensures that autistic children can focus, understand, and participate in the classroom environment," and it is delivered in the child's natural environment "because children must learn skills in the environment in which" they will be used. *E.S. v. Manhattan-Ogden Unified Sch. Dist. 383*, No. 5:26-cv-04032-AJP-ADM, at *11-12, 10 (D. Kan. Aug. 4, 2026). Without it, "the teacher must address the autistic children's adverse behaviors instead of focusing on the curriculum." *Id.*, at *12.

72. ABA is also not self-executing. It "is administered pursuant to individualized treatment plans designed and implemented by a Board-Certified Behavior Analyst." *Id*., at *3. The BCBA writes the protocols, trains the staff who deliver them, observes delivery, checks fidelity, reads the data, and corrects course when the data require it. Mohammad's BIP assigns exactly those functions to "MSCS's BCBA," who "will provide initial and ongoing staff training on [his] BIP," and provides that the District "will conduct direct observation at least once per month during the academic school year as a part of [his] ABA services on his IEP." Hr'g Ex. 3, § VIII.

73. Beginning on or about October 3, 2025, the District had no such person for Mohammad. Its BCBA testified that she was not asked to continue. No witness identified a successor. No document in evidence identifies one.

74. Upon information and belief, the reason no successor was identified is that there was none to identify: MSCS, the largest school district in Tennessee, employed no other Board Certified Behavior Analyst during the 2025-2026 school year and employs none today.

75. The consequence was not merely that Mohammad lost two hours of scheduled service each week. It was that the methodology his IEP made a condition of his participation — across all academic and nonacademic settings — was left to be improvised by a paraprofessional and a teacher, neither of whom is a behavior analyst, with no one to train them, observe them, or correct them. Improvised applied behavior analysis is not applied behavior analysis. It is what Ms. Kragseth documented goal by goal in February 2026: prompts at the wrong level, materials missing, procedures abandoned, and data that "doesn't reflect the target skill outlined in the goal." Tr. Vol. II at 258; see also Tr. Vol. II at 254-265. Bad data is

76. Nondisabled students at Germantown High School are taught by licensed professionals trained and supervised in the methods appropriate to their instruction. For the whole of the 2025-

2026 school year, Mohammad was not. The absence of any qualified supervisor for the single methodology his IEP identified as necessary to his participation is a structural impediment to access, and it is one the District created and has not cured. Mohammad was left able to attend school, but not able "to attend in a substantive sense with an equal opportunity to participate." *E.S.*, at *13.

77. The District cannot claim that providing behavior analytic supervision would fundamentally alter its services. It furnished exactly that accommodation during the 2024-2025 school year through Ms. Wyatt, and it separately contracted and paid for outside behavior analytic consultation from the Holland Center across four visits. Nothing in the record suggests either arrangement caused the District any documented difficulty. A district that has already provided an accommodation without incident cannot establish that the same accommodation is fundamentally altering. *E.S.*, at *15-16; *K.N. v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334, 351 (D.N.J. 2019) (finding also that failure to provide support to address behaviors was denial of a reasonable accommodation under the ADA and Section 504).

78. Mohammad remains enrolled at Germantown High School in the 2026-2027 school year. Upon information and belief, the District still has no Board Certified Behavior Analyst assigned to him. The denial of access alleged here is ongoing.

79. On the morning of September 18, 2026, Mohammad's IEP team met again to discuss the District's next proposed IEP draft. The District has shown its true colors, and has unilaterally stripped out all mention of ABA.

80. Mohammad needs ABA to access his education. MSCS is now denying it outright.

***Consultation Purchased, MSCS Declines to Implement with Fidelity***

81. The second failure of implementation is broader and spans both years. The District agreed to accept consultation from the Holland Center. It adopted the consultants' recommendations — all but one of the nine — and wrote them into the Behavior Intervention Plan governing Mohammad's instruction. It then declined to implement what it had adopted with the fidelity applied behavior analysis requires.

82. The Final Order found that "[n]either the agreement between Petitioners and Respondent nor the contract between Respondent and Holland Center required Respondent's employees or the IEP team to adopt any recommendations of Holland Center," and that "the IEP team did not agree that any of the specific recommendations, procedures, or steps for teaching any particular goal or benchmark" were binding. The first of those propositions concerns what the contracts obliged; the second concerns what the team in fact agreed to, and it is wrong. The District's Prior Written Notice for the October 1, 2024 IEP meeting, read into the record by the District's own BCBA on direct examination by District counsel, recites the team's agreement to each of the report's nine numbered recommendations by number and by name. Tr. Vol. II at 96-97. The Behavior Intervention Plan adopted on October 30, 2024 then carried those recommendations forward section by section and in the same order: Token Economy, Motivating Operation Manipulations, Effective Instructional Delivery, Manding, Physical Education Class, Activities of Daily Living, Data Collection, Program Oversight, and Use of a One-on-One Professional. Ex. 3, §§ I-IX. The team recorded one departure, and only one — it kept the one-to-one paraprofessional with Mohammad during lunch for safety and table manners rather than withdrawing that support — and it memorialized the departure in the plan itself. Ex. 3, § IX. A team that adopts nine recommendations and notes its single exception on the face of the document has not declined to agree to "any" of them. And whatever the contracts required, the IEP incorporated "ABA

methodology, verbal behavior instructions, as represented in BIP." Once those procedures were written into the IEP and the BIP, they were no longer recommendations. They were the program, and the District was obliged to deliver them.

83. The Final Order nevertheless found that "[n]either the BIP, October 2024 IEP, nor October 2025 IEP listed specific recommendations for skill acquisition," and reasoned that "[t]he instructor was to use his or her discretion to provide the appropriate prompts and prompt hierarchy." That is contrary to the admitted exhibit as read into the record by the District's own BCBA. The BIP assigned the prompt hierarchy. The most the record supports is that it did not map that hierarchy goal by goal, which is what Ms. Wyatt meant when she said the BIP "gives an example, but it doesn't go to an exact goal." Tr. Vol. II at 101.

84. The distinction matters because the District's defense, and the Final Order's holding, rest on the proposition that there was nothing methodologically specific to fail to implement. There was.

85. As to whether the specified procedures were in fact used, the record contains evidence the Final Order never resolved. Mohammad's one-on-one paraprofessional of three years, Gail Glenn, testified that the Holland Center "will come in and give their recommendations, but they haven't physically say [sic] give a training. They hadn't say [sic] sit down and work with [Mohammad] and say well, this is how this should be done, A, B, C, D, like that." Tr. Vol. I at 284. Asked what feedback she received, she answered: "They telling [sic] me I was doing well as I was working with them. That was the feedback." Tr. Vol. I at 285. Ms. McKinney testified that the team could not review the consultation reports "page by page because we run out of time in most of our meetings," and that the recommendations were helpful "to some extent," chiefly "in communicating with the parents." Tr. Vol. II at 145. Despite this attempt to minimize the Holland

Center training, Ms. Glenn went on to describe exactly how the Holland Center consultants demonstrated how to prompt him. Tr. Vol. I at 286-290.

86. Nonetheless, the Final Order credited the District's witnesses as "reliable" without also crediting the Holland Center consultants who testified. And the ALJ made this determination and ignored the Holland Center consultants' testimony.

***Goal by Goal: What the Consultants Saw and What the Final Order Ignored***

87. Petitioners' due process complaint pleaded, first among its issues, the District's "[f]ailure to implement Mohammad Albanna's IEP with fidelity" and its failure to "[f]ollow agreed instructional methodologies necessary to implement the goals." Petitioners proved that claim goal by goal. The Final Order does not address it.

88. Jamie Kragseth, M.A., BCBA, the Holland Center consultant who conducted the February 2026 visit, was called near the end of the second hearing day, placed under oath, and told: "you only have about 20 minutes, less than actually." Tr. Vol. II at 254. Within that window Petitioners walked her through Mohammad's IEP goals one at a time and asked, as to each, whether it was being implemented as written and as trained. Her answers were consistent and specific.

89. <u>The time goal</u>. Mohammad was to check a digital clock and relate the time to his scheduled activity. Ms. Kragseth observed the paraprofessional using a schedule posted on a refrigerator — an aid the consultants "had talked about stopping using after my September session." The schedule listed no times at all, and its activities were "pre typed in, so they were not specific to what [Mohammad] was supposed to do in that moment." Tr. Vol. II at 254-255. "Without that information there, the para wasn't able to reference the proper information. So the teaching procedures weren't able to be implemented as we discussed either." Tr. Vol. II at 254-255.

90. The matching-word-to-picture goal. The goal as written required Mohammad to read a word and match it to a picture. Ms. Kragseth observed it "implemented as just requiring that [Mohammad] read the words that were presented to him … No pictures were present. It was just reading the words." Tr. Vol. II at 257. Asked whether data collected on a reading-only task would represent his skill acquisition on a match-to-picture goal, she answered: "The data that was collected doesn't reflect the target skill outlined in the goal." Tr. Vol. II at 257-258.

91. The weigh-and-record goal. Mohammad was to weigh an item and enter the weight into an electronic spreadsheet. "The electronic form was not present"; after weighing, "the para wrote the number from the scale on his token board"; and so "he never had the opportunity to transfer that information directly from the scale to the electronic form" — "which was how the goal was outlined in the original recommendations." Tr. Vol. II at 258-259. Ms. Lundgren testified that on the related quantity-entry goal Mohammad was performing "0% independently" as of February 2025. Tr. Vol. I at 216.

92. The sorting goal. The materials matched the goal, but "the teaching procedures that I observed did not match the recommendations that had been given in September." Tr. Vol. II at 259-260. Staff used "vocal and gestural prompts" where "it was outlined in the original report to utilize physical prompts only," and on one occasion "the stimuli that was presented to MA was pre sorted." Asked whether an 80% score on pre-sorted materials measures the scale written into the IEP goal, she answered: "No." Tr. Vol. II at 260.

93. The match-to-sample goal. Asked whether, in February, the goal was "being implemented as you had trained, provided the data sheets and what kind of prompts should be used," she answered: "No." Tr. Vol. II at 261-262.

94. The typing goals. Procedures for the typing.com lessons were "implemented mostly correctly." But on the goal requiring Mohammad to type his personal information into a form, "[Mohammad] was given an opportunity to fill out the entire form without correction being provided," whereas the September recommendations called for error correction to "occur immediately." Tr. Vol. II at 263-264. Errorless teaching is written into Mohammad's BIP. Asked whether the BIP's effective teaching procedures were being implemented by the paraprofessional, she answered: "portions of them, but not, not entirely, no." Tr. Vol. II at 263-264.

95. The bathroom and hand-washing goals. Asked as to each whether "the teaching procedures and the BIP recommendations" were being followed, she answered "No" and "No." Tr. Vol. II at 264.

96. The transition and navigation goal. The September recommendations called for a clear purpose and "a clear instruction illustrating that he should walk independently." Ms. Kragseth instead observed staff asking "show me a room" or "where is a room?" — to which Mohammad responded by pointing rather than walking — and observed that staff "would also periodically stop him to have him hold the door for them, which interfered with his ability to continue walking on his own." Tr. Vol. II at 265.

97. The pattern is not random error. In each instance the goal remained on paper exactly as written while the instruction delivered under it was something else: a matching goal run as a reading goal, a data-entry goal run without the form, a sorting goal run on pre-sorted materials, an independence goal run in a way that interrupted independence. Data were then collected and reported against the written goal. The predictable result is progress reporting that measures something other than the skill the IEP promised to teach — which is precisely what the Final Order determined in Findings 30 and 31 without ever asking why.

98. Ms. Kragseth also described why candid consultation had become difficult. District staff made "comments … about the way that … Holland Center staff have represented the school staff in reports in the past"; when she praised a staff member, "there were comments that, you know, I better remember that when I write it in my report"; and staff "told me that they felt that the report made them look bad, which I think affected my ability to feel comfortable expressing recommendations." Tr. Vol. II at 271. She was "met with a very … uncomfortable interaction" when she pointed out that the matching-words-to-pictures goal required pictures. *Id*.

99. In error, the ALJ did not admit Ms. Kargseth's written consultation report.

100. Ms. Kragseth was cross-examined and then excused without redirect, the ALJ having asked whether the District would be calling another witness and, on being told that it would, ruling: "then there is no time for redirect examination. … That's all the time we have today." Tr. Vol. II at 278. The District then called one more witness, its occupational therapist, who testified at length. Tr. Vol. II at 279-300.

101. The Final Order contains no finding on any of this. It does not find that any particular goal was implemented as written. It does not find that any particular goal was not. It neither credits nor rejects Ms. Kragseth's goal-by-goal testimony, or Ms. Lundgren's, anywhere in its Findings of Fact or its analysis. It disposes of the subject with the general statement that "the IEP team did not agree that any of the specific recommendations, procedures, or steps for teaching any particular goal or benchmark" applied — a proposition about what the team agreed to, not a finding about what the District did, and one the District's own Prior Written Notice and Behavior Intervention Plan refute in any event. Tr. Vol. II at 96-97; Ex. 3, §§ I-IX.

### *Data That Could Not Measure Anything*

102. The parents' due process complaint pleaded, as a discrete violation, that the District failed to accurately collect and report data and thereby deprived them of the information required for meaningful participation in educational decision-making. The ALJ found in their favor on the underlying facts and then never followed the findings where they led.

103. Finding of Fact 19 records that "the IEP team agreed to use the data sheets provided by Holland Center for the data collection." Finding of Fact 30 concludes that "the Holland Center data sheets *did not accurately reflect* whether [Mohammad] made progress." Finding of Fact 31 adds that the sheets "did not specify which type of prompts or specific steps in any procedures identified on the data collection sheets and BIP were to be used with any goal," and that "[n]either the data collection sheet, any IEP, nor the BIP specified who was responsible for completing a data collection sheet."

104. Taken together, those findings establish that the agreed instrument for measuring Mohammad's progress produced information that could not measure it, that no one was designated to complete it, and that it was not tied to any procedure or goal. If that is so, the parents sat through IEP meeting after IEP meeting, six in the 2025-2026 school year alone on the District's own count, receiving progress information the ALJ has now found unreliable.

105. The Final Order recites the parents' data claim among the alleged violations and then collapses seven pleaded issues into one implementation question and one harm question. It never asks whether unreliable progress reporting impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to their son. See 34 C.F.R. § 300.513(a)(2).

106. Testimony at hearing, however, revealed that the data that was being recorded was not being recorded accurately.

107. Plaintiffs further note that Finding 30's characterization, that scoring a response as unsuccessful unless performed independently on the first attempt rendered the data inaccurate, is contrary to the unrebutted testimony explaining the method. Ms. Hemming testified that independence-based scoring was chosen precisely because it "inform[s] progress towards the IEP goal based on the way that those IEP goals were written, which was to some percentage of independence," and because more granular prompt-level collection would "bog down the people providing the educational instruction." Tr. Vol. I at 111-112.

108. Inaccurate data is not a lesser version of missing data. It is a different and more damaging thing. Missing data announces itself. A parent who receives no progress report knows to ask, an IEP team that has nothing to review knows it cannot make a data-based decision, and the statutory trigger to revise the IEP for "any lack of expected progress toward the annual goals" operates on a visible gap. 20 U.S.C. § 1414(d)(4)(A)(ii)(I). Data that is collected, scored, recorded, and reported against a written goal it does not measure announces nothing. It closes the inquiry it should have opened. The IEP team met, reviewed sheets that on the ALJ's own finding "did not accurately reflect whether [Mohammad] made progress," and moved on, because the paper showed a program functioning.

109. Every safeguard the IDEA builds around progress measurement — the requirement that the IEP state how progress will be measured and when it will be reported, 20 U.S.C. § 1414(d)(1)(A)(i)(III), 34 C.F.R. § 300.320(a)(3); the obligation to revise when expected progress does not occur, § 1414(d)(4)(A)(ii)(I); and the parents' right to participate in decisions about the provision of FAPE, § 1415(b)(1), 34 C.F.R. § 300.501(b) — depends on the reported numbers meaning what they purport to mean. When they do not, the safeguards do not fail loudly. They report success.

110. The record shows the mechanism, goal by goal. A goal written to require Mohammad to read a word and match it to a picture was run as a reading task with no pictures present, and data was taken and reported against the written goal; as Ms. Kragseth put it, "[t]he data that was collected doesn't reflect the target skill outlined in the goal." Tr. Vol. II at 257-258. A sorting goal was run on materials that had been pre-sorted before presentation, and Ms. Kragseth confirmed that a resulting score of 80% does not measure the scale the IEP goal set. Tr. Vol. II at 259-260. A weigh-and-record goal was run without the electronic form the goal required, with the paraprofessional writing the number on Mohammad's token board instead, so the recorded step was never the step being taught. Tr. Vol. II at 258-259. In each instance the number that reached the progress report was not merely imprecise. It described a different task than the one the IEP obligated the District to teach. And under the Behavior Intervention Plan the IEP team adopted, those same numbers were the input to programming: the team was to "make data-based programming decisions to make recommendations and determinations for [Mohammad's] IEP/BIP." Ex. 3, § VIII. Corrupt the measurement, and you corrupt every decision downstream of it, including the decision to leave a goal unchanged for a second year.

111. The consequence for the parents was not a lost opportunity to object. It was the loss of any basis on which to know that objection was warranted. Ayesha Shah and Zakaria Albanna attended every IEP meeting, six in the 2025-2026 school year alone, and were entitled to participate meaningfully in decisions about their son's education. What they were given to participate with was progress information the ALJ has now found unreliable, generated on sheets that, on Finding of Fact 31, did not specify which prompts or procedures applied to any goal and did not identify who was responsible for completing them.

112. Parents cannot be expected to monitor an IEP's implementation, or to invoke the dispute resolution procedures Congress gave them, on the strength of records that misdescribe what was taught and how the child performed. A procedural violation denies FAPE where it impedes the parents' opportunity to participate in the decision-making process regarding the provision of FAPE. 34 C.F.R. § 300.513(a)(2); 20 U.S.C. § 1415(f)(3)(E)(ii)(II). That is this case. And the Final Order confirms the point by the use it makes of its own finding: it invokes the unreliability of the Holland Center data to discount Petitioners' proof that Mohammad was not progressing, while simultaneously concluding that "[t]he proof showed that [Mohammad] made progress during the two academic years in question," without identifying any reliable data supporting that conclusion. Unreliable data cannot be a shield against a showing of no progress and a sword establishing progress in the same order.

***The Hearing Did Not Afford a Full and Fair Opportunity to Be Heard***

113. The parents appeared without counsel. The ALJ confirmed their waiver of counsel on the record at the outset of Day 1.[6] The District appeared through two attorneys from its in-house Office of General Counsel.

114. On June 1, 2026, three weeks before the hearing, the pro se parents filed PETITIONERS' MOTION FOR ADDITIONAL HEARING TIME, MODIFICATION OF HEARING SCHEDULE, AND MEMORANDUM OF LAW IN SUPPORT. They asked for one additional hearing day or, alternatively, four to six additional hours. They explained that the case spanned two school years and approximately twenty-six IEP goals; that they intended to call an independent educational evaluator, Dr. Thoraya Nasser, along with three Holland Center

[6] The Memphis-Shelby County region has very few lawyers with special education experience, and even fewer with such experience who represent parents and their children with disabilities.

consultants and multiple District employees; and that they bore the burden of proof. They warned, in writing and in advance, that without additional time they "will be forced to curtail witness testimony, limit examination of critical witnesses, or omit relevant evidence necessary to establish their claims." They invoked 20 U.S.C. § 1415(h)(2) and 34 C.F.R. § 300.512(a)(2), and noted that they were "proceeding without counsel while Respondent is represented by legal counsel."

115. The ALJ refused to grant an additional hearing day and instead expanded the parents' time within the existing two-day structure and bifurcated liability from remedy. Plaintiffs acknowledge, as the ALJ observed on the record, that the parents ultimately received just over nine hours of hearing time against the District's roughly seven and a half.

116. Petitioners' inability to present expert proof was not solely a function of the clock. In a prehearing order, the ALJ limited the report and testimony of Dr. Thoraya Nasser, who performed Mohammad's independent educational evaluation in April 2024, on the ground that Petitioners had already obtained relief predicated on that evaluation and could not rely on it again.

117. That ruling misapprehended the purpose for which the evaluation was offered. Petitioners did not offer Dr. Nasser to reassert any claim released by the August 30, 2024 settlement. They offered her to establish two background facts on which the claims actually before the Final Order depended: what Mohammad's baseline skills were before the Holland Center engagement began, and why an outside ABA consultation was necessary at all. The principle that a party may not relitigate a resolved claim does not convert the historical record into inadmissible matter.

118. The consequence was severe and one-sided. Dr. Nasser's evaluation had documented, among other things, that "[u]sing errorless teaching techniques, [Mohammad] is able to type 6-7 wpm with an accuracy of 73%" — evidence that errorless teaching, the very procedure

his BIP later required, produced measurable academic gain for him. Having limited the only qualified evaluator Petitioners intended to call, the Final Order then held against them, three separate times, that "no expert testified."

119. The harm the parents predicted is the harm that occurred. Dr. Nasser never testified. Her independent educational evaluation never came into evidence. None of the Holland Center's follow-up consultation reports came into evidence. And when the proof closed, the ALJ declined to hear any oral evidence on remedy and denied leave to supplement the written remedy request, explaining that the bifurcation undertaken to give the parents more time on liability had consumed the time available for relief.

120. The Final Order then held the absence of that evidence against them. It states three separate times that no expert testified: that "[n]o expert testified that a different implementation or methodology used by Respondent would have produced different results"; that "no expert testified that any steps or procedures in either IEP or the BIP were not implemented"; and that "no expert testified that the methodology used by Respondent employees was deficient." It also recorded, in a footnote, that although the parents' witness list identified Ms. Hemming as a "Holland Center expert," she "was neither offered nor accepted as an expert witness at the hearing." Unrepresented parties do not know that a witness must be formally tendered and qualified. That is what counsel is for, and it is what additional hearing time was requested to mitigate.

121. The constraint fell hardest on the proof that mattered most. Ms. Kragseth — the consultant who had observed Mohammad's program most recently — was reached only after the District had rested, was allotted "about 20 minutes, less than actually," and was excused with no redirect because "that's all the time we have today." Within that window she testified that nine

separate IEP goals were being implemented other than as written. Her report was not admitted. Petitioners were then told that the absence of expert proof defeated their case.

122. Plaintiffs further submit that the Rules of Evidence were applied with a rigor Tennessee law does not require of a contested case and that the IDEA does not contemplate for a proceeding designed to be accessible to parents. Under the Tennessee Uniform Administrative Procedures Act, the administrative judge “shall admit and give probative effect to evidence admissible in a court, and when necessary to ascertain facts not reasonably susceptible of proof under the rules of court, evidence not admissible thereunder may be admitted if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs.” Tenn. Code Ann. § 4-5-313(1). Special education due process cases in Tennessee are contested cases heard within that framework. Tenn. Code Ann. § 49-10-606.

123. The documents excluded here fell squarely within that provision. The Holland Center’s follow-up consultation reports of February 13, 2025, September 2025, and March 4, 2026 were written by consultants the District retained and paid, produced within the scope of that engagement, and authored by witnesses who appeared at the hearing and submitted to cross-examination. They are precisely the kind of material reasonably prudent persons, and IEP teams, rely upon in the conduct of their affairs. Indeed the IEP team did rely on them: the District’s own Prior Written Notices record the team acting on Holland Center recommendations.

124. The exclusions compounded. The ALJ barred Ms. Lundgren from consulting her own report while testifying about a visit roughly sixteen months earlier: “She can’t testify from her report. She has to testify from her own memory in relation to this document.” Tr. Vol. I at 205. No refreshed-recollection procedure was permitted. At the close of proof, the ALJ then denied

admission of Ms. Kragseth's report in part because Ms. Kragseth "never requested to refresh her recollection with that." Tr. Vol. II at 307. The earlier ruling had made that request futile.

125. The exclusions were also asymmetric in effect. The District was permitted to have the September 2025 Holland Center report marked as Proffered Exhibit A and to cross-examine Ms. Hemming from its contents at length, eliciting testimony about what the report did and did not contain. Tr. Vol. I at 181-183. The ALJ thus heard the District's characterization of documents it never read, while the parents were barred from putting the documents themselves before it.

126. The parents preserved, on the record, the argument that the reports were admissible as statements of the District's authorized agent, the agency relationship having been established by Ms. Hemming's cross-examination testimony that the District retained and paid the Holland Center. Tr. Vol. II at 10-12. The ALJ ruled against them.

127. Additionally, mid-direct examination and with no objection pending, the ALJ interrupted Ms. Lundgren's testimony to announce that it was "simply not credible," and then told the parents: "Ms. Hemming said they didn't do any training for anything that wasn't, didn't have a goal base. So you can continue down that line and I can find Ms. Hemming's testimony not credible or you can continue down this line and find Ms. Lundgren's testimony not credible. But they're contradicting each other." Tr. Vol. I at 211. The parents were thus invited, mid-examination, to choose which of their own two witnesses would be disbelieved.

128. The ALJ's premise was mistaken. Ms. Hemming had not so testified. On cross-examination she described two categories of recommendation: those "meant to be implemented throughout the entire school day" — "the token economy, MO manipulations, effective teaching procedures" — and a narrower set specific to certain classes or goal types. Tr. Vol. I at 173. Ms. Lundgren described the same two-tier structure, testifying that the September 2024 training

focused on "general teaching procedures that could be used to just assist [Mohammad] in being more independent across a variety of skills," together with review of and recommendations on the draft goals. Tr. Vol. I at 201, 214-215. The admitted September 2024 report describes the same architecture. The two witnesses agreed with each other and with the exhibit.

129. The Final Order never made the credibility finding the ALJ had floated. It contains no credibility assessment of Ms. Hemming, Ms. Lundgren, Ms. Kragseth, or either parent. Its express credibility findings run in one direction only: "All Respondent employees provided credible testimony"; "[t]he credible testimony of Respondent employees proved"; "Respondent employees provided credible testimony that they cared for [Mohammad]."

130. Relatedly, Finding of Fact 8 states that no Holland Center employee who worked with District personnel "held special education degrees." Ms. Hemming testified: "I have a master's degree in Education, Special Education." Tr. Vol. I at 113. The finding is contrary to the evidence, and it is the sort of finding that colors the weight given to an entire body of testimony.

131. The IDEA guarantees a hearing before an impartial hearing officer, 20 U.S.C. § 1415(f)(3)(A); 34 C.F.R. § 300.511(c), and that guarantee is concerned with the structure and appearance of the proceeding as much as with any decisionmaker's state of mind. The examination of Ms. Wyatt at the close of her testimony did not satisfy it. After counsel had finished, the ALJ took over questioning and told the witness: "if I told you, as a judge who hears IEP cases, IDEA cases, that I was surprised that [Mohammad] had a BIP based on what's been presented to me, would you find that surprising or not surprising?" Tr. Vol. II at 124-125. Ms. Wyatt answered, "No, not with your background." The ALJ then asked why the BIP had been written at all, and Ms. Wyatt answered that "[i]t was really pressed upon us," that "the team really had to fight on some IEP things, and sometimes it was easier to give in to the parents," and that the pressure came from

"Mom and dad." Tr. Vol. II at 125. The tribunal next asked whether "if the teaching is done appropriately, all progress can be made on every child and every goal," and then whether "some of [Mohammad's] goals were too high for his abilities," to which the witness answered yes. Tr. Vol. II at 126. When Ms. Shah sought to examine the witness on that answer, the ALJ refused: "No, you're not asking questions, Ms. [Shah]. I am." Id.

132. Three consequences follow. First, as a matter of weight, a finding is not supported by the record merely because a witness assented to a proposition the ALJ had already announced as her own view; the ALJ supplied the conclusion, and Finding of Fact 17 then reiterates that conclusion.

133. Second, the refusal to permit the parents to examine Ms. Wyatt on testimony the ALJ had just elicited — testimony characterizing Plaintiffs as having obtained their son's behavior plan by pressure rather than by professional judgment — denied them the right to present evidence and to confront and cross-examine witnesses that 20 U.S.C. § 1415(h)(2) guarantees. This was not an isolated constraint. The same hearing saw the parents told they had "about 20 minutes" for a witness, Tr. Vol. II at 254, and saw Ms. Kragseth excused without redirect, Tr. Vol. II at 278.

134. Third, and cumulatively, an ALJ that informs a witness of her view of the merits <u>before</u> the proof has closed, develops the record in support of that view through her own leading questions, and then declines to let the opposing party test the resulting answers has departed from the neutral role the statute assigns. Due process requires a decisionmaker who is not committed to an outcome before the evidence is complete. Whatever latitude a hearing officer has to question witnesses, see Tenn. R. Evid. 614(b), it does not extend to supplying the answer and then foreclosing examination on it.

***The Hearing Officer Decision and Errors***

135. On July 20, 2026, the ALJ entered a Final Order determining that the District provided Mohammad with FAPE and that the District is the prevailing party on all claims.

136. First, and principally, the Final Order resolves the 2025-2026 school year without a single finding addressing who provided the BCBA-delivered ABA services, BIP staff training, and monthly direct observation that Mohammad's IEP and BIP required for that year. The uncontradicted testimony of the District's own BCBA is that she was not asked to continue after October 3, 2025. Finding of Fact 32 confines her service to "the relevant 2024-2025 school year." The Order's statement that "[a]ll testimony ... proved that all four areas were met" is supported only by a recitation of her 2024-2025 conduct. The conclusion is unsupported by any finding as to the year it purports to resolve.

137. Second, the Final Order's findings that the IEP team did not agree to any of the Holland Center's specific recommendations, that the BIP and IEPs contained no specific recommendations for skill acquisition, and that prompting was left to instructor discretion, are each contradicted by the District's own admitted exhibits as read into the record by the District's own witness on direct examination by District counsel. The Prior Written Notice recites the team's agreement to all nine recommendations; the Behavior Intervention Plan reproduces them section by section; and the single departure the team made is recorded in the plan. Tr. Vol. II at 96-97; Ex. 3, §§ I-IX. Those findings are clearly erroneous, and they are load-bearing.

138. Third, the Final Order applied the wrong legal standard to materiality. Having recited that only material failures violate the IDEA, citing *Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 819 (9th Cir. 2007), it held in the alternative that the parents lost because "no proof was submitted that [Mohammad] would be in a different position today than he would have been with different implementation," and because "[n]o expert testified that a different implementation or

methodology used by Respondent would have produced different results." Demonstrable differential outcome is not an element of a failure-to-implement claim. Nor does the IDEA condition proof of an implementation failure on expert opinion; whether services promised in an IEP were delivered is a question of fact provable by percipient witnesses and by the LEA's own records.

139. Fourth, the Final Order recites seven pleaded violations and adjudicates one. It never separately analyzes the claim that inaccurate data collection and progress reporting impeded the parents' participation in educational decision-making, notwithstanding its own Findings 19, 30, and 31.

140. Fifth, the Final Order rests on procedural rulings that, cumulatively, denied Plaintiffs a full and fair opportunity to be heard as described above, and then relied on the evidentiary gaps those rulings produced as grounds for decision.

141. Sixth, the Final Order contains findings contrary to the evidence, including Finding of Fact 8, and rests in material part on credibility determinations made exclusively in favor of one party's witnesses while declining to make any as to the other's.

142. The same is true of Finding of Fact 17, which states that Mohammad "did not struggle to behave in class," and that "[d]espite [his] lack of challenging behavior and the opinion of Jennifer Wyatt … that a BIP was not necessary, the IEP team agreed to an implementation of an 11-page BIP at Petitioner A.S.'s and Petitioner Z.A.'s request." The finding is contradicted by the admitted exhibit it purports to describe: the BIP records thirty-seven observed instances of six interfering behaviors, concludes that they occur "when the difficulty and number of demands increases, and when the motivation to escape instruction increases," and states that effective reinforcement "will eliminate behaviors that are off-task or interfere with instruction." Hr'g Ex. 3,

pp. 2-3. It is contradicted by Ms. Hemming's observational testimony that these were "the behaviors that were identified at the time to be impeding with his ability to make academic progress," Tr. Vol. I at 81, and that roughly thirty of the thirty-seven instances followed the presentation of academic demands, supporting the conclusion that Mohammad was "engaging in those behaviors in order to escape having to complete academic demands," Tr. Vol. I at 85. It is contradicted by the District's own September 2024 progress report, which recorded that Mohammad was "using a lot of escape behavior, asking to go to the restroom to work." Tr. Vol. I at 30. And it is contradicted by the IEP team's own minutes, which describe the very behaviors the finding dismisses as "interfering with instruction" and "interfering with progress." Tr. Vol. II at 132. The finding is legally mistaken as well. The statutory trigger is behavior that impedes a child's learning, not behavior that is "challenging" or that "prevent[s]" learning altogether; escape-maintained off-task behavior occurring thirty-seven times in a single observation period impedes learning whether or not it disrupts the classroom. 20 U.S.C. § 1414(d)(3)(B)(i). And the finding's closing rationale — that the targeted behaviors "address[ed] behaviors relating to Petitioner [Mohammad's] Autism or ADHD diagnosis" — inverts the statute. Behavior is not removed from the special factors analysis because it is a manifestation of the child's disability. That is the circumstance the provision exists to address.

143. Seventh, the Final Order makes no finding whatever on the claim Petitioners pleaded first and proved in the most detail: that the District failed to implement Mohammad's IEP goals as written. Ms. Kragseth testified, goal by goal, that the time goal, the matching-word-to-picture goal, the weigh-and-record goal, the sorting goal, the match-to-sample goal, the personal-information typing goal, the bathroom goal, the hand-washing goal, and the transition and navigation goal were each implemented other than as written or as trained. Ms. Lundgren testified

to the same effect on the goals she observed. That testimony is unrebutted — no District witness contradicted any of it — and the Final Order neither credits nor rejects it.

144. Eighth, the Final Order rests in part on an evidentiary ruling that was legally erroneous. On the District's hearsay objection, the ALJ admitted the September 16, 2024 Holland Center Consultation Training Report — Exhibit 2 — "for proof that the training occurred and that a report was made, but not for the truth of the matter asserted," and directed immediately afterward that "[w]e're not going to have any testimony from the report itself." Tr. Vol. I at 76. That ruling treated the report as the out-of-court statement of a stranger to the proceeding. It was nothing of the kind. MSCS retained and paid the Holland Center under a Professional Services Agreement the District entered into to discharge its obligations under the August 30, 2024 settlement, and the Holland Center authored the report within the scope of that engagement — facts the District's own counsel established on cross-examination of Ms. Hemming, and which Petitioners invoked on the record in support of admission. Tr. Vol. II at 10-12. A statement offered against a party that was made by a person the party authorized to speak on the subject, or by the party's agent concerning a matter within the scope of the agency and during its existence, is admissible against that party for its truth; it is not hearsay excluded by the rule but a statement of a party-opponent. Tenn. R. Evid. 803(1.2)(C), (D); accord Fed. R. Evid. 801(d)(2)(C), (D). In any event, the rules of court do not set the outer bound of admissibility in a Tennessee contested case, where the administrative judge may receive evidence not admissible under those rules if it "is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs." Tenn. Code Ann. § 4-5-313(1). This report is precisely such evidence, and the record proves it: Mohammad's IEP team, its District members included, relied on this very document across the October 1 and October 30, 2024 IEP meetings and incorporated its recommendations into the Behavior Intervention Plan and the

operative IEP, as the District's own Prior Written Notice records. Tr. Vol. II at 97; Ex. 3. The error was not harmless. The report supplies the baseline and the methodological premises against which every implementation question in this case must be measured, and the Final Order then held the resulting evidentiary gap against Petitioners, stating three separate times that "no expert testified" to matters the report addresses. In any event, The report is also a record of a regularly conducted activity under Tenn. R. Evid. 803(6), maintained by the District in the ordinary course of the engagement. Because this ruling turned on a legal misapprehension of the hearsay rule rather than on any exercise of educational expertise, it is owed no deference in this Court.

145. Finally, the ALJ erred by failing to admit the other Holland Center Consultation reports.

***Request to Supplement the Administrative Record and to Submit Additional Evidence***

146. In an action brought under 20 U.S.C. § 1415(i)(2), this Court "shall receive the records of the administrative proceedings" and "shall hear additional evidence at the request of a party," and shall grant such relief as it determines appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(i)-(iii). Plaintiffs invoke both provisions.

147. Plaintiffs' present counsel did not represent the family in the administrative proceeding. Ayesha Shah and Zakaria Albanna appeared pro se throughout, from the filing of the due process complaint through the close of proof and post-hearing briefing. They are not lawyers, and they did not maintain a litigation file of the kind counsel would have kept.

148. Section 1415(i)(2)(C)(i) directs that this Court "shall receive the records of the administrative proceedings." Upon the filing of that record, Plaintiffs will review it in full and, if it so warrants, will seek leave under Federal Rule of Civil Procedure 15(a)(2) to amend this Complaint — to conform the pleading to the certified record, to correct any citation or

characterization, and to plead additional facts or claims that the complete record supports. Plaintiffs will likewise move under § 1415(i)(2)(C)(ii) to supplement the record and to submit additional evidence as described above.

## IV. LEGAL CLAIMS

### *COUNT I*
### *INDIVIDUALS WITH DISABILITIES EDUCATION ACT*

149. Plaintiffs re-allege the previous paragraphs as if set forth fully herein.

150. MSCS violated Mohammad's substantive rights under IDEA when it failed to deliver the ABA services from a Board Certified Behavior Analyst that his IEPs required throughout the 2025-2026 school year.

151. Applied behavior analysis was listed on Mohammad's October 3, 2025 IEP as Direct Special Education — specially designed instruction — and not as a related service, with Jennifer Wyatt identified by name as the provider and service dates running from October 3, 2025 through October 2, 2026. MSCS delivered none of it.

152. MSCS violated Mohammad's substantive rights under IDEA when it failed to provide the initial and ongoing BCBA staff training and the monthly direct observation that his Behavior Intervention Plan required throughout the 2025-2026 school year.

153. MSCS violated Mohammad's substantive rights under IDEA when it failed to implement his IEP goals as written, including the time goal, the matching-word-to-picture goal, the weigh-and-record goal, the sorting goal, the match-to-sample goal, the personal-information typing goal, the bathroom goal, the hand-washing goal, and the transition and navigation goal.

154. MSCS violated Mohammad's substantive rights under IDEA when it failed to implement the prompting hierarchy, prompt fading procedures, token economy, and errorless

teaching procedures specified in his Behavior Intervention Plan with the fidelity applied behavior analysis requires.

155. MSCS violated Mohammad's procedural rights and his Parents' rights under IDEA when it collected and reported progress data that did not measure the skills his IEP goals described, depriving Parents of the information necessary to participate meaningfully in educational decision-making.

156. Plaintiffs were denied a full and fair opportunity to be heard in the administrative proceeding, and the Final Order rested on the evidentiary gaps that resulted.

157. The Final Order is erroneous for the reasons stated above and is not entitled to deference.

## *COUNT II*
## *TITLE II OF THE AMERICANS WITH DISABILITIES ACT*

158. Plaintiffs re-allege the previous paragraphs as if set forth fully herein.

159. The ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. The ADA "is the Federal Government's most recent and extensive endeavor to address discrimination against persons with disabilities," *Olmstead v. L.C.*, 527 U.S. 581, 589 n.1 (1999), and is intended "'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Id.* at 589.

160. Mohammad has a qualifying disability. He is a qualified individual with a disability within the meaning of 42 U.S.C. § 12102. MSCS is a public entity within the meaning of 42 U.S.C. § 12131(1).

161. Mohammad is otherwise qualified for MSCS's educational program. He resides within the District, is enrolled at Germantown High School, and can meet the program's necessary requirements with reasonable accommodation. *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435-36 (6th Cir. 1998).

162. MSCS reasonably could have accommodated Mohammad's disability and did not. The accommodation he requires is applied behavior analysis delivered with fidelity across academic and nonacademic settings, designed and supervised by a Board Certified Behavior Analyst. MSCS knew of that need: it wrote the need into Mohammad's IEP and his Behavior Intervention Plan, it furnished the accommodation during the 2024-2025 school year, and it contracted and paid for outside behavior-analytic consultation across four visits.

163. Beginning on or about October 3, 2025 and continuing to the present, MSCS ceased to provide that accommodation. It assigned no Board Certified Behavior Analyst to Mohammad and, upon information and belief, employs none other than Jennifer Wyatt who has declined to work with Mohammad.

164. The accommodation Mohammad seeks is reasonable, and the accommodation MSCS provided in its place — instruction improvised by staff who are not behavior analysts, with no one to train, observe, or correct them — was unreasonable. *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023).

165. MSCS's failure to accommodate impeded Mohammad's ability to participate in and benefit from its educational program. Id. MSCS itself classified applied behavior analysis as Mohammad's specially designed instruction rather than as a supportive related service, so withholding it did not merely diminish a support; it withdrew one of the two forms of instruction

through which Mohammad accesses his education. Mohammad was able to attend school; he was not able to attend in a substantive sense with an equal opportunity to participate.

166. The denial of that modification is the but-for cause of Mohammad's exclusion. "When a plaintiff shows that the proposed modification is needed to avoid the denial of services or benefits, the causation requirement is satisfied." *Douglas v. Muzzin*, No. 21-2801, 2022 U.S. App. LEXIS 21529, at *17 (6th Cir. Aug. 3, 2022); see *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

167. MSCS cannot establish that providing BCBA supervision would fundamentally alter the nature of its services or impose an undue financial or administrative burden. It furnished that accommodation during the 2024-2025 school year without documented difficulty.

168. Plaintiffs are entitled to equitable relief under Title II, 42 U.S.C. § 12133, including compensatory educational services and the prospective provision of qualified BCBA supervision.

***COUNT III***
***SECTION 504 OF THE REHABILITATION ACT***

169. Plaintiffs re-allege the previous paragraphs as if set forth fully herein.

170. Section 504 provides: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

171. Section 504 has a separate FAPE requirement for students with disabilities. Section 504 FAPE "is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

172. Mohammad is an individual with a disability within the meaning of 29 U.S.C. § 705(20), and is otherwise qualified to participate in MSCS's educational program. MSCS's operations are a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

173. Section 504 obligates MSCS to provide Mohammad with "regular or special education and related aids and services that … are designed to meet [his] individual educational needs … as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b). It did not. Nondisabled students at Germantown High School are taught by licensed professionals trained and supervised in the methods appropriate to their instruction. For the whole of the 2025-2026 school year, and continuing, Mohammad was not.

174. Section 504 also obligates MSCS to make reasonable modifications to its policies, practices, and procedures where necessary to avoid discrimination. *Alexander v. Choate*, 469 U.S. 287, 299-300 (1985); *Fry v. Napoleon Cmty. Schs*., 580 U.S. 154, 159-60 (2017). Providing applied behavior analysis designed and supervised by a Board Certified Behavior Analyst, whether employed by the District or retained from outside it, is such a modification. MSCS refused or failed to make it.

175. Mohammad was excluded from participation in, and denied the benefits of, MSCS's educational program solely by reason of his disability. *Lewis v. Humboldt Acquisition Corp*., 681 F.3d 312, 317 (6th Cir. 2012) (en banc). The sole reason Mohammad requires behavior-analytic instruction to access his education is his autism; no other characteristic accounts for the need or for its denial.

176. Plaintiffs need not prove discriminatory intent. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 909 (6th Cir. 2004). Congress understood discrimination against

people with disabilities to be "most often the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect." *Alexander v. Choate*, 469 U.S. at 295. That description fits this record: a district that agreed to a program, purchased the expertise to run it, and then let the person responsible for it walk away without replacing her.

177. Plaintiffs are entitled to equitable relief under Section 504, 29 U.S.C. § 794a(a)(2), including compensatory educational services and the prospective provision of qualified behavior-analytic supervision.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1. Assume jurisdiction of this action;

2. Accept and review the records of the administrative proceedings, and permit Plaintiffs to supplement that record so that it is complete;

3. Take such additional evidence as the Court determines necessary and proper, 20 U.S.C. § 1415(i)(2)(C)(ii);

4. Reverse the Final Order and declare that Memphis-Shelby County Schools denied Mohammad a free appropriate public education under the IDEA during the 2024-2025 and 2025-2026 school years by failing to implement his IEPs and Behavior Intervention Plan;

5. Declare that Memphis-Shelby County Schools denied Mohammad a free appropriate public education under Section 504 for the 2025-2026 school year;

6. Declare that Memphis-Shelby County Schools violated Mohammad's rights under Section 504 and the ADA by failing to provide the behavior-analytic services (ABA)

necessary for him to enjoy meaningful access to the District's educational programs, and that the violation is ongoing;

7. Award Mohammad compensatory education sufficient to place him in the position he would have occupied had the District implemented his IEPs and Behavior Intervention Plan with fidelity, in a form and on a schedule that can be completed before his eligibility ends, including a fund or bank of services deliverable by a qualified provider of the family's selection;

8. Order Memphis-Shelby County Schools, for so long as Mohammad remains eligible, to provide applied behavior analysis (ABA) services designed, supervised, and monitored by a qualified Board Certified Behavior Analyst, and to retain such a professional from outside the District if it does not employ one;

9. Order Memphis-Shelby County Schools to convene Mohammad's IEP team, with the participation of a qualified Board Certified Behavior Analyst, to revise his program consistent with the Court's judgment;

10. Award Plaintiffs reimbursement of the educational and evaluative costs they incurred as a result of the District's failures;

11. Award Plaintiffs reasonable attorneys' fees, expenses, and costs, 20 U.S.C. § 1415(i)(3)(B); 34 C.F.R. § 300.517; 42 U.S.C. § 1988;

12. Grant Plaintiffs leave to amend this Complaint, and to supplement the administrative record, upon the filing of the complete record of the administrative proceedings; and

13. Award such other relief as the Court deems just and proper.

Date: September 18, 2026

Respectfully submitted,

*s/Janet H. Goode*
Janet H. Goode, TN BPR #35872
917 Cooper Street
Memphis, TN 38104
901-308-7511
janet@janetgoodelaw.com

**Attorney for Plaintiffs**

# Exhibit A

***Final Order dated July 20, 2026***