**State of Tennessee**
**Department of State**
Administrative Procedures Division
312 Rosa L. Parks Avenue
William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472

**July 20, 2026**

Ayesha Shah
9173 Randle Valley Drive
Cordova, TN 38018
Sent via email also to: ayeshas100@aol.com

Mohammad Albanna
9173 Randle Valley Drive
Cordova, TN 38018

Zakaria Albanna
9173 Randle Valley Drive
Cordova, TN 38018
Sent via email also to:
zakaria_albanna@yahoo.com

Tricia Craig
Tennessee Department of Education
Andrew Johnson Tower
710 James Robertson Parkway
Nashville, TN 37243
Sent via email only to: Address on File

Christian West-Coleman, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112
Sent via email only to:
westcolemanc@scsk12.org

Laura Bailey, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112
Sent via email only to: baileyla@scsk12.org

**RE: A.S., THE PARENT AND M.A., THE STUDENT AND Z.A., THE PARENT V. MEMPHIS-SHELBY COUNTY SCHOOLS, APD Case No. 07.03-262423J**

Enclosed is a *Final Order*, including a *Notice of Appeal Procedures,* rendered in this case.

Administrative Procedures Division
Tennessee Department of State

Enclosure(s)

**BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION**
**DIVISION OF SPECIAL EDUCATION**

**IN THE MATTER OF:**

**M.A., THE STUDENT, *and***
**A.S. AND Z.A., THE PARENTS,**
***Petitioners,***

***v.*** **APD Case No. 07.03-262423J**

**MEMPHIS-SHELBY COUNTY SCHOOLS,**
***Respondent.***

**FINAL ORDER**

This contested case arises from claims made under the INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) and was heard before Administrative Judge Claudia Padfield[1] on June 23-24, 2026, in Memphis, Tennessee. Petitioners, M.A., the student, and his parents, A.S. and Z.A., were represented by Petitioners A.S. and Z.A., having waived the right to legal counsel. Attorneys Laura Bailey and Christian West-Coleman represented Respondent, Memphis-Shelby County Schools.

Pursuant to the ORDER DENYING MOTION FOR ADDITIONAL HEARING TIME issued on June 4, 2026, the parties were ordered to upload into the secure drop box for proposed exhibits a "separate pre-hearing brief, with attached affidavits and supporting documents, to address any requested relief or remedy by June 22, 2026." Petitioners complied with the ORDER, and the document was made part of the RECORD as of June 22, 2026. Pursuant to the ORDER SETTING HEARING issued on May 27, 2026, the transcript with hearing exhibits was filed on July 1, 2026. On July 8, 2026, Petitioners filed PETITIONERS' POST-TRIAL BRIEF, and Respondent filed

[1] Judge Padfield is an independent and neutral administrative judge assigned by the Tennessee Secretary of State's Administrative Procedures Division (APD) to preside over the case and to issue a final order under TENN. CODE. ANN. § 4-5-314. *See* TENN. CODE ANN. § 49-10-606(a). She neither works for the Tennessee Department of Education nor for Respondent.

RESPONDENT'S *PROPOSED* FINDINGS OF FACT AND CONCLUSIONS OF LAW. As such, the RECORD closed on July 8, 2026. The FINAL ORDER is due to be issued on or before July 21, 2026.

On July 9, 2026, unilaterally and without permission or leave of this tribunal, Petitioners filed PETITIONERS' NOTICE TO THE COURT REGARDING THE COMPLETENESS OF THE RECORD AS TO EXHIBIT 15. Petitioners had the opportunity to examine all documents submitted as proposed exhibits prior to and during the due process hearing. Petitioners had the opportunity to object to the document coming into evidence at the hearing, which they did not. Petitioners, *sua sponte*, seek to alter the RECORD by submitting an unauthenticated document in place of EXHIBIT 15. The filing is disregarded in its entirety.

The issue in this case is whether M.A. was denied a free and appropriate public education (FAPE) and, if so, the appropriate remedy. Based on the testimony and evidence accepted at the hearing and the arguments of the parties, it is **DETERMINED** that Respondent provided Petitioner M.A. with FAPE.

## SUMMARY OF EVIDENCE

Eight witnesses testified on Petitioners' behalf: 1) Petitioner A.S.; 2) Marietta Hemming, Holland Center consultant;[2] 3) Taylor Lundgren, Holland Center consultant; 4) Gail Glenn, Respondent employee and M.A.'s full-time paraprofessional; 5) Jennifer Wyatt, Respondent employee and Board-Certified Behavior Analyst (BCBA); 6) Baretta McKinney, Respondent employee and M.A.'s special education teacher; 7) Petitioner Z.A.; and 8) Jamie Kragseth, Holland Center consultant. Three witnesses testified on Respondent's behalf: 1) Ms. McKinney;

[2] The parties were ordered to file proposed witness and exhibit lists by June 16, 2026. Petitioners filed a MASTER EXHIBIT LIST AND MASTER WITNESS LIST on June 16, 2026. While the documented listed Ms. Hemming as a "Holland Center expert," Ms. Hemming was neither offered nor accepted as an expert witness at the hearing. Petitioners' attempts to alter or amend the document, via a filing on June 22, 2026, was without leave of this tribunal but did not alter any witness or proffered exhibit at the hearing.

2) Petitioner Z.A.; and 3) Dr. Emily Smith, Respondent employee and M.A.'s occupational therapist.

Fifteen exhibits were entered into evidence at hearing.[3] Respondent proffered one exhibit into evidence, which was identified as Proffered Exhibit A.

FINDINGS OF FACT

1. Petitioner M.A., date of birth August 3, 2006, has a diagnosis of autism spectrum disorder (Autism), attention-deficit/hyperactivity disorder (ADHD), dysgraphia, and dyslexia.[4]

2. Petitioner M.A. has been enrolled with Respondent for many years as a special education student. The primary disability on Petitioner M.A.'s Individual Education Program (IEP) is Autism. In May 2025, Petitioner M.A. graduated from Germantown High School with a special education diploma. After turning 19 years old, Petitioner M.A. returned to Germantown High School for the 2025-2026 school year due to his status as a special education student.

3. Petitioner M.A. has undergone applied behavior analysis (ABA) therapy for at least 10 years. Petitioners have engaged various ABA therapy programs over the last 10 years. For the five years prior to the current due process complaint, Petitioners contracted with Holland Center to provide Petitioner M.A. with ABA therapy at their home.

4. Despite years of special education through public school and ABA therapy and other services Petitioners have obtained for him, Petitioner M.A. has limited independent skills. He reads at approximately a second-grade level. He cannot consistently and accurately

---

[3] EXHIBIT 2 was accepted into evidence, but all hearsay statements and opinions therein are not considered for the truth of the matter asserted.

[4] After Petitioner M.A. reached the age of majority on August 3, 2025, Petitioners A.S. and Z.A. then became his conservators.

dial his father's telephone number, as he often confuses the numbers 6 and 9. While Petitioner M.A. can type, he cannot consistently write or type his own name correctly. He requires prompting when navigating from one location to another on a campus. His math skills are at a kindergarten level; he needs prompting to count to 100. He cannot always button and unbutton his shirt correctly or independently complete a bathroom hygiene routine.

5. Petitioners filed a due process complaint against Respondent in August 2022, which resulted in a September 9, 2022 settlement agreement and release. Petitioners filed two due process complaints against Respondent during the 2023-2024 school year. Both due process complaints were voluntarily dismissed by Petitioners. The second 2024 due process complaint resulted in an August 30, 2024 settlement of all the issues.

6. As a result of the August 30, 2024 settlement, and at Petitioners' request and by agreement of the parties, Respondent entered into a contract with Holland Center. As part of the agreement, Respondent paid for travel, accommodations, and per diems for Holland Center employees to Memphis. Holland Center employees provided training to Respondent's employees to work with Petitioner M.A. Holland Center employees participated in IEP meetings. Holland Center employees observed Respondent's employees and provided feedback or corrections for working with Petitioner M.A. according to ABA therapy. Neither the agreement between Petitioners and Respondent nor the contract between Respondent and Holland Center required Respondent's employees or the IEP team to adopt any recommendations of Holland Center.

7. After the August 2024 settlement, Holland Center employees went to Germantown High School twice in the 2024-2025 school year and twice in the 2025-2026 school year. Each time the employees came to Memphis, they also worked with Petitioner M.A. at Petitioners' home.

8. None of Holland Center employees who worked with Respondent personnel were trained teachers, held special education degrees, or had provided ABA therapy to special education students in a public-school setting.

9. All Respondent employees who were observed or trained by Holland Center employees were open to the Holland Center training and attempted to adopt the training in their teaching with Petitioner M.A.

10. An average IEP is formulated and implemented after a two-hour IEP meeting with an IEP team.

11. After the August 2024 settlement, three IEP meetings, each approximately three hours long, were held to formulate and adopt Petitioner M.A.'s IEP. After two meetings, Petitioners A.S. and Z.A. were not satisfied with the IEP such that a third three-hour IEP meeting was held, and the final amendment to the IEP was effective October 30, 2024.

12. Four transition goals were on the October 2024 IEP, one of which was to "acquire and refine motor skills necessary to use a handheld can opener with 80% accuracy." EXHIBIT 4, p. 7.

13. The IEP included ten annual goals involving basic reading skills, math calculation, adaptive behavior/independence, speech/language, and behavior. Each goal had one to five benchmarks/short-term instructional objectives. As an example of a benchmark involving the goal for behavior, "When given hand held items, [M.A.] will refrain from putting non-food items in his mouth with 100% accuracy per day across three consecutive days, as documented by data collection daily." EXHIBIT 4, p. 15.

14. The October 2024 IEP indicated that Petitioner M.A. would receive classroom instruction and Community Based Instruction (CBI). As he has trouble typing, he was provided

with an adapted keyboard over Petitioner A.S.'s objection. Petitioner M.A. was to be placed in the functional skills classroom with a special education teacher five days a week for six hours per day. He was to receive ABA therapy from a BCBA two times a week for 60 minutes each session. A speech language pathologist was to see him 12 times per month for 30 minutes a session. He was to receive occupational therapy six times a month for 30 minutes a session. Lastly, he was to have a one-on-one paraprofessional five days a week for seven hours a day.[5]

15. Accommodations in the October 2024 IEP were to give directions in alternative formats (written/picture/verbal, etc.); give directions in small, distinct steps; repeat oral instructions verbatim; and provide rest or breaks.

16. Under "Supplementary Aids, Services, and Least Restrictive Environment," the IEP listed that "ABA methodology, verbal behavior instructions, as represented in BIP [Behavior Intervention Plan] to be used across all academic and nonacademic settings" as a response to "[s]upport(s) or training needed by school personnel in order to support the student in their goal(s)." EXHIBIT 4, p. 15. The IEP directed that "the paraprofessional will fade support" when appropriate. *Id*. p. 17.

17. Petitioner M.A. did not struggle to behave in class. Despite Petitioner M.A.'s lack of challenging behavior and the opinion of Jennifer Wyatt, Petitioner M.A.'s BCBA, that a BIP was not necessary, the IEP team agreed to an implementation of an 11-page BIP at Petitioner A.S.'s and Petitioner Z.A.'s request. The targeted behaviors did not address any aggressive, disruptive, or other behaviors that prevented Petitioner M.A. from learning. Rather, the targeted behaviors, such as removing glassing, forced yawning, or getting off task, addressed behaviors relating to Petitioner M.A.'s Autism or ADHD diagnosis.

[5] Petitioner M.A. was in school five days a week. While the IEP listed that Petitioner M.A. would receive 4155 minutes per week of special education services. that equated to 831 minutes per day, or 13 hours and 51 minutes a day. As the paraprofessional was always with Petitioner M.A., some of the services overlapped.

18. The September 16, 2024 Holland Center report, as written by its employees, was considered when drafting Petitioner M.A.'s BIP.

19. The BIP directed that a token economy, motivating operation manipulations, and effective instructional delivery techniques would be used. Additionally, the IEP team agreed to use the data sheets provided by Holland Center for the data collection. The token economy was used regarding observable behaviors and with a varying rate of exchange.

20. All Respondent employees who worked with Petitioner M.A. were provided with a copy of the BIP. Holland Center employees, as well as Ms. Wyatt, provided training and support with how to use the token economy, implementation of the motivating operation manipulations, and delivery of the effective instructional techniques. Respondent employees utilized the data collection sheets provided by Holland Center.

21. The BIP determined four areas to ensure program oversight:

- [Respondent's] BCBA will provide initial and ongoing staff training on [Petitioner M.A.'s] BIP.
    - The Holland Center's quarterly trainings and support will occur quarterly, unless a different cadence occurs pursuant to the Holland Center's Professional Services Agreement with the District.
- The Holland Center will provide scheduled trainings and support as outlined in their Professional Services Agreement with the District.
- [Respondent] will conduct direct observation at least once per month during the academic school year as a part of [Petitioner M.A.'s] ABA services on his IEP.
- The IEP Team will make data-based programming decisions to make recommendations and determinations for [Petitioner M.A.'s] IEP/BIP.
    - Data collection will be completed by [Respondent] staff.
    - The Holland Center's input and recommendations will be considered by the IEP Team.

22. The IEP team met after Holland Center employees observed Respondent staff in February 2025 observations. The IEP team discussed Petitioner M.A.'s learning, as well as Respondent employees' methods of working with Petitioner M.A. Holland Center employees participated in those discussions. The IEP team determined that no amendments or alterations to the IEP were needed after these discussions.

23. A new IEP was adopted on October 3, 2025, after multiple IEP meetings that lasted multiple hours.

24. There was one transition goal with seven benchmarks on the October 2025 IEP. As an example of the benchmarks, Petitioner M.A. was to "sort up to 20 items for each of 6 categories by attributes (such as material type, function, size, shape) with 80% accuracy for each category, across three consecutive opportunities, as measured by daily data collection." EXHIBIT 10, p. 5.

25. The IEP included five annual goals involving basic reading skills, adaptive behavior/independence, speech/language, and behavior. The services provided and accommodations remained unchanged.

26. Gail Glenn has worked full-time with Petitioner M.A. for three years. She is his one-on-one paraprofessional and has a master's degree in special education.

27. While Ms. Glenn did not participate in the IEP meetings, she was aware of the goals and benchmarks on the IEPs, as well as the information in the BIP. Ms. Glenn allowed Petitioner M.A. to complete tasks by himself but would use prompts, including physical, gestural, and verbal prompts, depending on the situation and the goal. Ms. Glenn utilized the token economy to help motivate Petitioner M.A. to complete his tasks independently.

28. Ms. Glenn was absent for medical reasons for six weeks during the 2024-2025 school year. Ms. Glenn loves Petitioner M.A. and was concerned about him in her absence. Knowing that she would be gone, Ms. Glenn contacted a retired paraprofessional, Suzanne Johnson. Ms. Johnson had previously worked in the special education classroom at Germantown High School. Ms. Glenn worked with Ms. Johnson prior to her absence to ensure that Ms. Johnson was aware of Petitioner M.A.'s IEP and BIP requirements.

29. Respondent employees worked with Holland Center employees when Holland Center employees came to observe and offer guidance. All Respondent employees provided credible testimony that they accepted Holland Center employees' guidance and attempted to incorporate the guidance and instruction into their teaching with Petitioner M.A.

30. Holland Center employees created very detailed data-tracking sheets to monitor Petitioner M.A.'s activities. Upon guidance and direction from Holland Center employees, teachers and staff were only to mark that Petitioner M.A. was completely successful on a task if it was completed without any guidance or direction. If Petitioner M.A. did not complete a task independently on the first attempt, Holland Center instructed Respondent employees to give Petitioner M.A. a negative mark on the data collection sheet. This contrasted with prior data tracking information wherein Respondent employees would indicate if Petitioner M.A. had made progress on a task, even if he needed guidance. As such, the Holland Center data sheets did not accurately reflect whether Petitioner M.A. made progress.

31. The data collection sheets did not specify which type of prompts or specific steps in any procedures identified on the data collection sheets and BIP were to be used with any goal. Neither the data collection sheet, any IEP, nor the BIP specified who was responsible for completing a data collection sheet.

32. Jennifer Wyatt was Petitioner M.A.'s BCBA during the relevant 2024-2025 school year. Ms. Wyatt observed Petitioner M.A. at least monthly, reviewed data, data collection, and the data collection methods of Respondent staff supporting Petitioner M.A. to assist the IEP team with data-based decision making. Ms. Wyatt was not required to provide written feedback to any staff; she provided oral feedback as needed. On the observations, Ms. Wyatt would provide immediate feedback to any staff who worked with Petitioner M.A., including modeling how to instruct on the particular goal in accordance with the IEP or BIP.

33. Ms. Wyatt provided ABA services to Petitioner M.A. at least two hours per week. Ms. Wyatt provided immediate teaching to Petitioner M.A. on his IEP.

34. Baretta McKinney, Petitioner M.A.'s special education teacher, collaborated with Ms. Glenn and other Respondent employees to fulfill Petitioner M.A.'s IEP. This included reviewing data sheets, compiling data, and providing direct instruction.

35. While she was open to receiving guidance from Holland Center employees, Ms. McKinney found that their recommendations were most helpful in communicating with Petitioners A.S. and Z.A.

36. Holland Center employees participated in the IEP meetings. The employees' input was considered when adopting the IEPs and BIP. While Holland Center's recommendations were considered at every IEP meeting, the IEP team did not agree that any of the specific recommendations, procedures, or steps for teaching any particular goal or benchmark.

37. Petitioners A.S. and Z.A. participated in every IEP meeting.

38. Neither the BIP, October 2024 IEP, nor October 2025 IEP listed specific recommendations for skill acquisition.

39. The October 2024 and October 2025 IEPs were reasonably calculated to provide Petitioner M.A. with FAPE and were designed with his individual and unique learning needs in mind.

40. The IEPs affirmatively guaranteed educational services. They did not require any specific teaching or training methods to be used toward any particular goal.

APPLICABLE LAW and ANALYSIS

When enacting the IDEA, Congress clearly conferred jurisdiction of a student's IDEA claims upon hearing officers, also known as administrative judges. 20 U.S.C. § 1415(f)(3)(A). Therefore, administrative judges are to determine whether a student received an appropriate education under the IDEA. 20 U.S.C. § 1415(f)(3)(E). In Tennessee, the Office of Secretary of State, Administrative Procedures Division, has jurisdiction over the subject matter and the parties of this proceeding and the undersigned administrative judge (the tribunal) has authority to issue final orders. *See* TENN. COMP. R. & REGS. 0520-01-09.-18; *see also* TENN. CODE ANN. § 49-10-101.The U.S. Supreme Court held in *Schaffer v. West* that the burden of proof is on the party "seeking relief." 546 U.S. 49, 51 (2005). Thus, when parents file a request for a due process hearing, the parents bear the burden of proof. *Id.* at 56; *see also*, *Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990).

Therefore, Petitioners in this case have the burden to introduce evidence that would, by a preponderance of the evidence, prove the issues alleged in the due process complaint should be resolved in their favor.

The presiding administrative judge has jurisdiction over the claims and parties and the authority to issue final orders. *See* TENN. COMP. R. & REGS. 0520-01-09-.18 (2023); *see also* TENN. CODE ANN. § 49-10-101.

The appealing party has the burden of proof. *See Schaffer v. Weast*, 546 U.S. 49, 51 (2005) (party seeking relief has the burden of proof); TENN. COMP. R. & REGS. 1360-04-01-.02(3) and (5). Here, Petitioners are the appealing party and bear the burden of proof. *Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990) (the party challenging the IEP bears the burden of proof in an IDEA action). Petitioners must prove, by a preponderance of the evidence, that the allegations should be resolved in their favor and that they are entitled to the relief sought.

The IDEA requires that a free and appropriate public education (FAPE) be made available to all children between the ages of 3 and 21. 34 C.F.R. § 300.101. The IDEA ensures that "all children with disabilities have available to them FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

The IEP need not be ideal but must "aim to enable the child to make progress" both academically and functionally. *Endrew F.*, 580 U.S. at 399-400. The instruction offered must be "'*specially* designed'" to meet a child's '*unique* needs' through an "[*i*]*ndividualized* education program." *Id.* at 400 (citing §§1401(29), (14)). The IEP "is [to be] constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth. §§1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv). Having considered the disability, achievements to date, and potential for growth, the IEP should aspire to be an "appropriately ambitious" educational program. *Endrew F.*, 580 U.S. at 402.

Petitioners alleged the following violations in the due process complaint based on Respondent's alleged failure to: 1) implement [Petitioner M.A.'s] IEP with fidelity, 2) follow agreed instructional methodologies necessary to implement the goals, 3) provide required ABA consultation service listed in the IEP, 4) ensure appropriate supervision and oversight, 5) accurately collect and report data, 6) deliver meaningful educational benefit, and 7) implement critical transition services. As relief for these alleged violations, Petitioners requested 600-800 hours of compensatory education,[6] continued Holland Center involvement for two years, independent BCBA oversight two to four hours a week, mandatory implementation of Holland Center recommendations, program reset with independence as primary outcome, compensatory transition services, and extended eligibility. Simplified, the issues in Petitioners' due process complaint are whether Respondent failed to implement Petitioner M.A.'s IEPs and BIP and, if so, whether the alleged implementation deficiencies substantially interfered with Petitioner M.A.'s acquisition of functional, vocational, communication, adaptive, and transition skills necessary for adult independence.

"Limited academic progress does not ipso facto signal a violation of the IDEA ... ." *A.W. v. Loudon Cnty. Sch. Dist.*, No. 3:20-cv-76, 2022 WL 4545609, at * 12 (September 28, 2022) (quoting *J.B. ex rel. Belt v. Dist. of Columbia*, 325 F.Supp.3d 1, 9 (D.D.C. 2018)). The proof showed that Petitioner M.A. made progress during the two academic years in question to the best of his abilities, which were extremely limited. The goals from the IEPs did not change because Petitioner M.A. did not make sufficient progress to change the goals, not because Respondent employees were not properly working with Petitioner M.A. to achieve those goals. Both IEPs listed transition goals for Petitioner M.A. It is unrealistic to expect that any level of services provided by Respondent would have achieved complete independence for Petitioner M.A. At the

[6] Considering a seven-hour school day, this equates to 85-114 days of services.

beginning of his senior year in high school, Petitioner M.A. still needed prompting and assistance with regular hygiene routines, basic sorting of materials, typing, not putting non-food items in his mouth, and leaving on his glasses.

There is no dispute that Petitioner M.A.'s 2024-2025 and 2025-2026 IEPs were reasonably calculated to provide Petitioner M.A. with FAPE or that they were designed with his individual and unique learning needs in mind. The evidence proved that Respondent substantially and significantly implemented the IEPs and BIP. Respondent did not commit any material implementation failures.

Beyond designing an appropriately ambitious IEP, including special education and related services, tailored to the unique needs of the particular child, a public school district must deliver special education and related services in conformity with the IEP to provide FAPE. 20 U.S.C. § 1401(9)(D). "A party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate" that Respondent "failed to implement substantial or significant provisions of the IEP." *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349(5th Cir. 2000). A local education agency provides FAPE when "significant provisions of the IEP [are] followed" even if there is clear evidence that portions of an IEP are not implemented at all. *Id*. at 348-349 (internal citation omitted). The focus on whether substantial or significant provisions of an IEP are followed allows local education agencies "some flexibility in implementing IEPs but still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit. *Id*. at 349.

"Only material failure to implement an IEP constitute violations of the IDEA." *Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 819 (9th Cir. 2007). To determine whether a material

implementation failure has occurred, courts should analyze whether the IEP services that were implemented conferred an educational benefit. The drafting and implementation of an IEP does not ensure that a student will achieve any particular educational outcome but that the student has access to an educational benefit. *Hendrick Hudson Central Sch. Dist. v. Rowley*, 102 S.Ct. 3034, 3043 (1982).

Petitioners played central roles in drafting the IEPs and BIP. Respondent took extraordinary steps to ensure that Petitioners were accommodated and included in all decision making. The data collection sheets, as drafted by Holland Center, were utilized by Respondent employees. The instruction and techniques suggested by Holland Center were utilized by Respondent employees, even if not quite as Petitioners envisioned. No proof was presented that Petitioner M.A. did not receive the speech therapy, occupational therapy, one-on-one paraprofessional services, special education teaching, and BCBA services identified in his IEPs. The credible testimony of Respondent employees proved that the IEPs and BIP were substantially and significantly implemented. Even Holland Center employees acknowledged that no document existed that included specific recommendations for skill acquisition. The data sheets did not specify which type of prompts or specific steps in any procedure identified on the data collection sheets and BIP were to be used with which goal. The instructor was to use his or her discretion to provide the appropriate prompts and prompt hierarchy depending on the goal in question and the level of mastery for any particular goal or benchmark. Like many special education students, Petitioner M.A. would need assistance on a task, even if he had previously made progress toward completing that task independently.

Petitioners allege that Respondent failed to properly implement Petitioner M.A.'s IEPs and BIP, which resulted in the denial of FAPE based on his disability-mandated requirements.

Respondent agreed to provide its employees with training in "ABA methodology and verbal behavior instructions, as represented in BIP to be used across all academic and nonacademic settings." EXHIBIT 4, p. 15. The proof demonstrated that Respondent ensured that all employees—BCBA, occupational therapist, special education teacher, speech therapist, and paraprofessional—received training in the ABA methodology and verbal behavior instructions. Respondent employees received this training from Holland Center employees. Additionally, Ms. Wyatt, herself a licensed BCBA, provided ongoing guidance and input to the other Respondent employees who worked with Petitioner M.A. on a daily basis.

Petitioners argued that by including the language that Respondent employees would receive support and training in ABA methodology that Respondent then agreed to use the ABA methodology in all teaching and interactions with Petitioner. Under this interpretation, Respondent would have agreed to provide Petitioner M.A. only with teaching done using ABA methodology—in essence, an entire school day of ABA therapy. To the contrary, nowhere in the IEPs or the BIP does it state that ABA methodology must be used at any time by any Respondent employees; the IEPs and BIP required that Respondent employees be trained in ABA methodologies, which they were. The local education agency was not required to provide Petitioner M.A. services using any particular methodology. "[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States." *Deal v. Hamilton Cty. Bd. of Ed*. 392 F.2d 840, 854 (6th Cir. 2005) (quoting *Rowley*, 458 U.S. at 207).

Petitioner M.A.'s BIP delineated four areas to ensure program oversight. All testimony, including testimony from Holland Center employees, proved that all four areas were met. Holland Center employees came to Germantown High School to train and support Respondent employees. Respondent's BCBA, Ms. Wyatt, provided initial and ongoing staff training,

including observing Petitioner M.A. at least once per month. Respondent employees utilized the data collection sheets provided by Holland Center. Holland Center's input and recommendations were considered for the drafting of the BIP and both IEPs at issue. Respondent employees provided credible testimony that they cared for Petitioner M.A. and wanted him to succeed academically and socially. Respondent employees did not renounce their special education, occupational therapy, or speech therapy training and techniques by agreeing to also be trained in ABA methodology. Rather, Respondent employees utilized the ABA methodology in addition to all of their other training, education, and experience in working with Petitioner M.A.

Assuming, *arguendo*, the IEPs and BIP were not implemented correctly, no proof was submitted that Petitioner M.A. would be in a different position today than he would have been with different implementation. Petitioners A.S. and Z.A. clearly love Petitioner M.A. and have been very active in ensuring he has received all services that might be beneficial for him. Even with near constant ABA therapy for more than 10 years and continual special education services, Petitioner M.A. has extremely limited skills for a 19-year-old male. His math level is that of a kindergartener, and he can read at only a second-grade level. While Petitioner M.A. can type, he cannot consistently type his father's telephone number or even spell his own name correctly. No expert testified that a different implementation or methodology used by Respondent would have produced different results. Additionally, no expert testified that any steps or procedures in either IEP or the BIP were not implemented. Lastly, no expert testified that the methodology used by Respondent employees was deficient in failing to implement the IEPs or BIP.

CONCLUSIONS OF LAW

1. Petitioners failed to meet their burden of proof to establish failure of Respondent to implement Petitioner M.A.'s 2024-2025 IEP or 2025-2025 IEP or a resulting denial of FAPE.

2. Petitioners failed to meet their burden of proof that the alleged implementation failures substantially interfered with Petitioner M.A.'s acquisition of functional, vocational, communication, adaptive, and transition skills necessary for adult independence.

3. Petitioners did not meet the burden of proof to show they are entitled to any requested relief.

4. Respondent is the prevailing party on all claims.

POLICY STATEMENT

The policy reason for this decision is to uphold the federal and state laws pertaining to the education of children with disabilities.

It is so **ORDERED**.

This FINAL ORDER entered and effective this the **20th day of July 2026**.

CLAUDIA PADFIELD
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

**IN THE MATTER OF:** **APD CASE No. 07.03-262423J**
**A.S., THE PARENT AND M.A., THE STUDENT AND Z.A., THE PARENT V. MEMPHIS-SHELBY COUNTY SCHOOLS**

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

The Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, was entered on **July 20, 2026**. If you disagree with this decision, you may take the following actions:

1. **File a Petition for Reconsideration:** You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration with the Administrative Procedures Division (APD). A Petition for Reconsideration should include your name and the above APD case number and should state the specific reasons why you think the decision is incorrect. APD must **receive** your written Petition no later than 15 days after entry of the Final Order, which is no later than **August 4, 2026.**

   The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration. If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted. If no action is taken within 20 days, the Petition is deemed denied. As discussed below, if the Petition is denied, you may file an appeal no later than **September 18, 2026**. *See* TENN. CODE ANN. §§ 4-5-317 and 4-5-322.

2. **File an Appeal:** You may file an appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **September 18, 2026**, by:

   (a) filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," TENN. CODE ANN. § 4-5-322; or
   (b) bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

   The filing of a Petition for Reconsideration is not required before appealing. *See* TENN. CODE ANN. § 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for Stay must be **received** by APD within 7 days of the date of entry of the Final Order, which is no later than **July 27, 2026**. *See* TENN. CODE ANN. § 4-5-316. A reviewing court also may order a stay of the Final Order upon appropriate terms. *See* TENN. CODE ANN. §§ 4-5-322 and 4-5-317.

### FILING

Documents should be filed with the Administrative Procedures Division by email *or* fax:

Email: APD.filings@tnsos.gov

Fax: 615-741-4472

**NOTICE OF APPEAL PROCEDURES**

In the event you do not have access to email or fax, you may mail or deliver documents to:

Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue
Nashville, TN 37243-1102